## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Deborah Smith, | Court File No. 08-6195 (MJD/JSM) |
| Plaintiff, | |
| v. | **DEFENDANT'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT** |
| Hilton Hotels Corporation d/b/a HHC-Hilton Minneapolis H&T, | |
| Defendant. | |

### INTRODUCTION

Plaintiff, Deborah Smith filed the instant action against her former employer, Hilton Hotels Corporation ("Hilton"), alleging she suffered from sex harassment and reprisal under the Minnesota Human Rights Act ("MHRA").  In her Second Amended Complaint, Smith alleges she witnessed an "orgy" one evening while working at Hilton. Smith's testimony, however, debunks her Complaint's sensationalized account of events because she admits the only evidence supporting her harassment claim was what she witnessed for eight seconds and there was no sex involved. Instead, Smith testified she saw four of her co-workers engaged in "sexual-type" simulated acts while fully clothed. As a matter of law, this eight second exposure is not sex harassment.

Furthermore, Smith alleges she first reported her co-workers' conduct that at a disciplinary meeting scheduled before the company was aware of her complaint.  Smith claims that Hilton retaliated against her for reporting this incident by providing her a reprimand, suspension, probationary period and then, ultimately terminating her

employment.   Smith admits, however, to the behavior addressed in the reprimand and further admits Hilton terminated her for failing to timely return from a medical leave of absence.   After reviewing Smith's own testimony, the Court will see this case for what it is − a sensationalized Complaint with no factual support.   The Court should grant summary judgment to Defendant on all counts.

## UNDISPUTED FACTS

### I.   BACKGROUND.

#### A.   Smith's Hire With Hilton.

Hilton hired Smith as the SkyWater Restaurant/Lounge evening manager in its downtown Minneapolis hotel in or around late March or early April 2006.[1]   (Smith Dep. 77-80; Smith Exs. 3-5; Vennewitz Dep. 14, 16).   James Vennewitz, Assistant Food & Beverage Manager, was Smith's immediate supervisor.   (Smith Dep. 98-99; Vennewitz Dep. 15).   Vennewitz reported directly to the Food & Beverage Director, Victor Salamone.   (Smith Dep. 99-100; Vennewitz Dep. 19).

#### B.   Smith's Job Duties As the SkyWater Evening Manager.

As the SkyWater Evening Manager, Smith oversaw the restaurant and bar staff as well as seeing that customer satisfaction and financial goals were met.   (Smith Dep. 86-

---

[1] The deposition transcripts and relevant exhibits cited herein are attached to the Declaration of Thomas E. Marshall, Esq. ("Marshall Decl."), submitted in support of this Motion.   For ease of review, the deposition transcript pages of the witnesses cited herein (Smith (Ex. A), Vennewitz (Ex. B), and Schultz (Ex. C)) are referenced herein with the deponent's last name and corresponding page number ("Name Dep. ##").   Any exhibits referenced herein correspond to the deposition exhibit and is cited with the deponent's last name and the exhibit number ("Name Ex. ##").   Any exhibits not included as a deposition exhibit are cited with reference to Marshall's Declaration (Ex. D).

87, 101-02).   After about one year, Smith also assumed responsibility for the lounge as well.   (Smith Dep. 101-02).   The SkyWater restaurant was open until around 10:00 or 11:00 p.m. and the lounge would stay open until 1:00 or 2:00 a.m.   (Smith Dep. 113). Smith was responsible for closing both the restaurant and lounge every night and Hilton expected her to know when it was appropriate to cut staff and close the two venues based on business flow.   (Smith Dep. 107-11).

### C.   Training Provided to Hilton Employees and Managers, Including Smith.

Hilton provided training to its managers, including Smith, on leadership, financial auditing and sexual harassment, among other topics.   (Smith Dep. 90).   Hilton provides its employees, including managers, with sex harassment training upon hire and also provides annual refresher courses.   (Smith Dep. 90-92; Schultz Dep. 14-16).   Smith acknowledged receiving Hilton's "Harassment Free Workplace Policy."   (Smith Dep. 90-92; Smith Ex. 5).

### D.   Smith Utilized the Services of Hilton's On-Site Human Resources Department.

Smith regularly consulted with Hilton's Human Resource Department regarding issues involving her staff.   (Smith Dep. 121-23; Schultz Dep. 20-21).   Because Smith worked the evening shifts, she called Tracie Schultz, then Human Resources Director, or Kristen Erdmann, another human resources employee, after hours for guidance.   (Smith Dep. 121-22; Schultz Dep. 20-21, 68-69).   Smith believed the Human Resources Department was always helpful and available.   (Smith Dep. 122-23).

## II.  SMITH'S PERFORMANCE AND PROBATION.

### A.  Job Expectations.

As the SkyWater Evening Manager, Smith was expected to act professionally at all times – not only with guests but with the staff.  Vennewitz spoke to Smith on several occasions about her gossiping with other employees, discussing her personal life, fraternizing with employees after hours, and warning her against talking negatively about the company and her job to staff.   (Vennewitz Dep. 17-18; Smith Dep. 193-95). Salamone also shared Vennewitz's concerns about Smith's lack of professionalism at times.  (Vennewitz Dep. 19-20; Schultz Dep. 21, 24-26).

### B.  Performance Reviews.

Vennewitz provided Smith with two performance evaluations during her employment at Hilton.  (Smith Exs. 6-7).  Smith admits the first review Vennewitz provided to her on November 6, 2006, was fair.  (Smith Dep. 111; Smith Ex. 6).  The review noted, "Debbie has good solutions to problems, but at times problems can consume her." (Smith Ex. 6).

Smith received another performance review in January 2007.  (Smith Ex. 7).  In this review, Vennewitz addressed several performance issues including talking negatively with staff members.  (Smith Dep. 118-19; Smith Ex. 7).  Smith testified:

> Q:  Did you ever say negative things about the Hilton in front of staff?
> A:  Only – maybe like the frustration with the food, like oh, my God, I think he's an idiot, I might have said that about John. I probably did, which is, again, inappropriate.

(Smith Dep. 119).   One of the goals Vennewitz gave Smith for the next year was to "increase manager accountability."  (Smith Dep. 125-26; Smith Ex. 7).

## III.   SMITH WITNESSES ALLEGED HARASSING BEHAVIOR.

In August 2007, the Hilton Minneapolis hosted the national sales manager conference where all sales directors/managers from Hilton hotels or Hilton brand hotels from around the country met for annual training.  (Smith Dep. 127).  Smith did not have many additional duties during this conference but was expected to maintain the restaurant and lounge, as usual, and provide impeccable service for Hilton visitors.  (Smith Dep. 129-30).  Smith knew she was to keep the lounge open during the conference until 2:00 a.m. each night.  (Smith Dep. 130-31).

Thursday, August 30th, was the last day of the conference and Hilton had planned a large party for the sales management including a dinner and dance, with a live band, scheduled to end at 1:00 a.m.  (Smith Dep. 132).  Smith knew the food and beverage department was also having a small party to celebrate the end of the conference because many of the staff had worked very hard to make the conference a success.  (Smith Dep. 151-53).  That evening, John Luke, Hilton General Manager, thanked the food and beverage managers and staff involved with the conference with a champagne toast. (Smith Dep. 151).

Smith was not invited to the party because she was scheduled to close the lounge. (Smith Dep. 136).  That night, the restaurant and lounge were very slow and around 12:40 a.m., Smith wanted to make last call and cut her staff.  (*Id.*).  However, knowing the party was going on upstairs, Smith wanted to consult with another banquet and/or

food and beverage manager working the party about whether she should close the lounge early because the party was scheduled to end around 1:00 a.m.  (Smith Dep. 134).  Smith tried to call the managers and went to the banquet rooms to consult with them but could not reach anyone.  (Smith Dep. 136-37, 139).  Ultimately, Smith made the decision to close the lounge early.  (*Id.*).  Smith testified:

> So I went back downstairs and I said well, it's ridiculous for us [lounge staff] to stand here all night if they're [employees at the sales director party] going to stay. I don't know. Because they're dancing. They all looked like they were staying to me. So that's the decision I made. So I said okay, let's make last call.

(Smith Dep. 137).

Smith, however, had second thoughts about her decision because she did not know when the party was ending in the banquet hall.  (Smith Dep. 140).  Smith knew it would be unacceptable if she did not have adequate staffing when the guests of the parties decided to patronize the lounge.  (*Id.*).  Furthermore, it is against Hilton policy for managers to serve tables so Smith needed staff to serve those customers.  (*Id.*).

Smith went back upstairs again about ten minutes later (around 12:50 a.m.) in another attempt to find someone to consult with about whether she should close the bar. (Smith Dep. 137, 139).  A security guard informed her that the food and beverage managers and some staff were in the conference room called "the Boardroom".  (Smith Dep. 137).  Smith opened the door to the Boardroom and yelled into the room: "Am I keeping the bar open or what?"  (Smith Dep. 148).  She immediately left after she heard Vennewitz say, "Yes, of course you are.  That's what John Luke wants."  (Smith Dep. 148-49; Vennewitz Dep. 32-34).  Smith asserts she was in the Boardroom for about one

minute.  (Smith Dep. 155).   However, security tapes from that evening show Smith opened the door at 12:51:16 and at 12:51:24, less than eight seconds later, closed the door and walked away never to return to the Boardroom that evening.  (Marshall Decl. Ex. D, Clips 19-20).

Smith alleges when she opened the door to the conference room she witnessed many of the food and beverage managers and banquet employees drinking excessively.  (Smith Dep. 150-51).  Smith testified that when she opened the door, she saw "lots and lots of drinks and bottles and glasses and, you know, wine bottles, alcohol bottles, beer bottles.  Everyone was laughing and having fun when I opened the door."  (Smith Dep. 150).  However, Smith admitted "I didn't spend a long time studying [the scene in the Boardroom].  So I really – there were people in that room drinking.  I couldn't tell you who they were."  (Smith Dep. 174).

Smith also alleges that she saw two "sexual-type" acts between different employees.  (Smith Dep. 150-51).  First, Smith alleges she saw a banquet staff employee ("Patti") sitting on the Assistant Beverage Manager's lap, ("Dave"), and rubbing his thighs and genitals while he tilted his head back saying "ooh."  (Smith Dep. 141).  Smith acknowledges Dave and Patti were both fully clothed – Dave was wearing his suit, including a tie, had his pants on and zipped, and his belt fastened while Patti was also wearing her work uniform.  (Smith Dep. 142-43).

Second, Smith also alleges she witnessed a woman with blonde hair lying on the Boardroom table with another management employee, ("Dale"), standing over her.  (Smith Dep. 143-45).  Smith described the position she saw these two individuals in:  she

saw the woman lying still with her legs bent over the side of the table and spread and Dale was standing between her legs, bending over her, up against the table. (Smith Dep. 144-45, 155-56). Smith further alleges Dale was making a "sexual movement where you would take your hips and grind upon another person." (Smith Dep. 146-47). Smith described it as looking like "sex" but admitted they were not engaged in sexual intercourse. (Smith Dep. 147, 169-70). Smith also testified she did not see any part of Dale's body exposed. (Smith Dep. 146). Smith admits no one propositioned her that evening and she never actually entered the room but instead, only stood in the doorway. (Smith Dep. 148-49, 155).

After returning from the Boardroom, Smith reopened the bar and told the staff they needed to stay. (Smith Dep. 157-60). Salamone was upset with Smith's behavior exhibited in the Boardroom and came down only minutes later to speak with her. (Smith Dep. 160-61; Vennewitz Dep. 35). Salamone accused Smith of "storming into the Boardroom and embarrassing [him]." (Smith Dep. 161). Salamone also expressed his displeasure in Smith's behavior because he believed leaving the bar open was something she should have known how to handle especially because the conference and party had not yet ended. (Smith Dep. 162-64).

## IV.    BEZDICHECK'S ALLEGATIONS AGAINST VENNEWITZ.

The next day, on September 1, 2007, April Bezdicheck, a Hilton server, called Smith and told her about what she alleged happened at the party the night before. (Smith Dep. 196). Bezdicheck alleged Vennewitz invited her to the hotel for the food and beverage party and that when she was there, he threw her on his lap and bounced her up

and down while holding her breasts. (Smith Dep. 196-97). Bezdicheck also told Smith that later that evening, Vennewitz tried to pull her into the elevator in an effort to get her to accompanying him to his room.[2] (Smith Dep. 196-97). Smith asserts Bezdicheck asked if she would accompany her to human resources to report what had happened. (Smith Dep. 197). Smith admits that she violated company policy by not immediately reporting Bezdicheck's concerns to human resources. (Smith Dep. 197-99). Smith did not take any affirmative measures to report what Bezdicheck had told her or what she had seen on the night of August 30th until Smith met with Human Resources to address admitted performance issues. (Smith Dep. 197-200).

## V.  HILTON FORMALLY ADDRESSES SMITH'S PERFORMANCE ISSUES AND SUSPENDS HER EMPLOYMENT PENDING FURTHER INVESTIGATION.

Smith worked the next night, Friday, September 1, 2007, without incident. (Smith Dep. 184). She then had the next four days off. (*Id.*). When she arrived at work on Wednesday, September 6, 2007, she was immediately asked to go to the human resources department for a meeting. (Smith Dep. 180). When she arrived for the meeting, Tracie Schultz and Kristin Erdmann were present. (Smith Dep. 191-92). Schultz had pre-prepared several questions to ask Smith addressing various performance issues brought to her attention by Vennewitz and Salamone. (Smith Dep. 191-92; Schultz Ex. 6).

During the meeting, Smith admitted to talking to other employees about a rumored relationship between two beverage employees, discussing her personal issues at work,

---

[2] Prior to this allegation by Bezdicheck, no employee had ever reported Vennewitz had acted inappropriately in the fifteen years he had worked for the hotel. (Vennewitz Dep. 48; Schultz Dep. 18-19, 46).

and expressing negativity about her job and Hilton with other employees, including those she supervised.  (Smith Dep. 181-82; Schultz Dep. 32-33).  Smith was specifically asked if she had told another employee that she did not like her job and whether she said, "f**k this job" or "f**k this place", referring to Hilton.  (Smith Dep. 182, 192-93).  Smith admitted she had made those comments.  (Smith Dep. 192-93).  Smith also admitted to ringing up tables when she knew those actions violated company policy.  (Smith Dep. 186-87).

After discussing the various performance issues, Schultz provided Smith with a Corrective Action Form, completed prior to the meeting, and notified her that she was suspended pending further investigation into the admitted performance issues.  (Smith Ex. 9; Smith Dep. 191-92, 217).  After completing its investigation, Hilton requested Smith return to work five days later.  (Smith Dep. 193).  This time Smith met with Schultz, Salamone and Vennewitz.  (Smith Dep. 193, 207).  During this meeting, Schultz presented Smith with a "Discussion Planner" summarizing the results of the investigation into the various performance issues addressed in the Corrective Action.  (Smith Dep. 193; Smith Ex. 10).  Smith admits she was guilty of the performance issues addressed in the Corrective Action and Discussion Planner.  (Smith Dep. 193-95).  Smith testified:

> Q: And it says …, "Debbie has been heard spreading gossip about other F&B managers."
> A: Yes.
> Q: And that was true?
> A: That was true.
> Q: "Debbie has admitted to going offsite with line [194] level staff to drink," and that was true?
> A: Yes.

Q: And you admitted saying "…she didn't like her job with specific comments like f\*\*k this place?"
A: That's true. I've admitted that.
Q: Would you agree your demeanor and negative attitude needed to improve?
A: Absolutely, after the very first of this September, yes.
Q: And you admit that Jim, Mr. Vennewitz, in the past had asked you not to take tables?
A: Yes.
Q: And you admit to talking about personal life issues with other team members?
A: Yes.

(Smith Dep. 193:19-25, 194:1-15; *see also* Smith Dep. 237).  Schultz thereafter informed Smith she was on probation for sixty days.  (Smith Dep. 195; Smith Ex. 9).  Smith improved her performance and successfully completed the probationary period.  (Smith Dep. 195).

## VI.   SMITH'S REPORT AND HILTON'S INVESTIGATION.

During the September 6th meeting with human resources, Smith reported what she saw in the Boardroom on August 30th and also what Bezdicheck told her on September 1st.  (Smith Dep. 182-83).  Prior to meeting with Smith, the General Manager had already reported to human resources some rumors he had heard regarding the party on August 30th and potential inappropriate behavior.  (Schultz Dep. 28-30).

In accordance with its policy against unwelcome behavior, Hilton immediately conducted an investigation into what happened the night of August 30th.  (Schultz Dep. 17, 28-31).  Schultz and Erdmann interviewed several employees, including Vennewitz and also watched surveillance tapes from that night.  (Vennewitz Dep. 58-59; Schultz Dep. 75-81; Schultz Ex. 6).  As a result of the investigation, Schultz issued Vennewitz

and several other managers and employees at the party on August 30th reprimands for their conduct, including excessive drinking.  (Schultz Dep. 18-19, 84, 100-01; Schultz Exs. 7-8).  Hilton also provided additional sexual harassment training to all employees, including Vennewitz.  (Vennewitz Dep. 48; Schultz Dep. 88-89).

Smith admits she never witnessed, nor was subjected to, any harassing acts other than what she witnessed on August 30th.  (Smith Dep. 228-29).  Smith never suffered a change in pay, hours, shift or position after August 30th.  (Smith Dep. 232).

## VII.   SMITH'S LEAVE OF ABSENCE AND TERMINATION.

On or about October 30, 2007, Smith requested a medical leave of absence between November 8, 2007 and December 1, 2007.  (Smith Dep. 218-19; Smith Ex. 11).  Smith later extended her leave of absence, by telephone, to December 15, 2007.  (*Id.*).  Both requests for leave, designated as leave under the Family and Medical Leave Act ("FMLA"), were approved by Hilton.  (Smith Dep. 220; Smith Ex. 11).

Smith's leave of absence request, signed and acknowledged by her, specifically states her "employment may terminate if I do not return to my job on or before the date this leave expires, or if I do not comply with all the requirements of the Leave of Absence Policy" and that she was required to provide periodic updates to her employer.  (Smith Dep. 219-20; Smith Ex. 11, ¶¶ 5, 7).  The FMLA policy in the Team Member handbook also states, "If you fail to return to work immediately after the period of approved leave expires, you will be considered to have voluntarily terminated, in accordance with applicable laws."  (Smith Ex. 13, pg. 11; Schultz Dep. 50-51).

Before Smith was due to return to work on December 15, 2007, Hilton provided her doctor a "Certification of Health Care Provider" form to provide Hilton information as to when and if Smith could return to work.  (Smith Ex. 14).  Hilton sent the form to Smith's doctor and asked for clarification by December 7, 2007.  (*Id.*).  Hilton did not hear from Smith or her physician and Smith did not report to work for her scheduled shift on December 15th.  (Smith Dep. 220).  Similarly, she did not report to work on December 16th or 17th.  (Smith Dep. 220-21).  On December 18, 2007, three days after she was scheduled to return, Smith's physician faxed the medical certification to Hilton releasing her to work on December 18th.  (Smith Dep. 223-24; Smith Ex. 14).  Smith did not report to work on the December 18th or again on December 19th.  (Smith Dep. 221).  As a result, Hilton considered her failure to return to work a voluntary termination.  (Smith Dep. 225-26; Schultz Dep. 50-52).

Smith has no knowledge of who made the decision to terminate her.  (Smith Dep. 219).  Vennewitz was not involved in the decision to terminate Smith's employment after she failed to return from leave as he too was on a medical leave of absence in December 2007.  (Vennewitz Dep. 23-24).

## STANDARD OF REVIEW

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (*quoting* Fed. R. Civ. P. Rule 1). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[S]ummary judgment is appropriate when a plaintiff fails to establish a factual dispute on an essential element of her case." *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1205 (8th Cir. 1997); *Wilking v. County of Ramsey*, 153 F.3d 869, 872 (8th Cir. 1998).

Pursuant to these decisions, Smith bears the burden of proof on her claims and the absence of any substantial evidence as to any element of her claim justifies summary judgment for Hilton. *See Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim.").  To defeat this Motion, Smith must introduce facts that are admissible at trial.   Smith's claims cannot survive summary judgment because no triable issues of fact exist establishing she suffered from a sexually hostile work environment or that she suffered an adverse employment action based on her report of harassment.

## LEGAL ARGUMENT

### I.    SMITH HAS NOT PRESENTED SUFFICIENT EVIDENCE TO SUPPORT A SEX HARASSMENT/DISCRIMINATION CLAIM.

Smith alleges in Count One that she was "subjected to unwelcome sexual conduct directed at her on the basis of her sex.  These actions constitute differential treatment because of sex." (2nd Am. Compl. ¶ 14).  Sexual harassment consists of "sexually motivated physical contacts, sexually derogatory statements and verbal sexual advances."

*Continental Can Co., Inc. v. State*, 297 N.W.2d 241, 249 (Minn. 1980).  A hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive" to alter the terms and conditions of employment.  *See Merwether v. Caraustar Packaging Co.,* 326 F.3d 990, 993 (8th Cir. 2003).

Smith admits the only time she experienced and/or witnessed any inappropriate sexual behavior was on the night of August 30th when she opened the door to the Boardroom.  (Smith Dep. 148-49).  Smith does not allege Vennewitz, her direct supervisor was involved in the alleged sex acts in the Boardroom or sexually harassed her.  (*See supra* Fact Section III).  In fact, Smith testified she did not see Vennewitz on the night of August 30th.  (Smith Dep. 148).

To establish a claim for hostile work environment/sexual harassment under the Minnesota Human Rights Act ("MHRA")[3], Smith must show she was subjected to unwelcome sexual conduct that affected a term, condition, or privilege of employment.  *See Danz v. Jones*, 263 N.W.2d 395, 398-99 (Minn. 1978); *Sigurdson v. Isanti Cty*, 386 N.W.2d 715, 719 (Minn. 1986); *Goins v. West Group*, 635 N.W.2d 717, 725 (Minn. 2001); *Stuart v. GMC*, 217 F.3d 621, 631 (8th Cir. 2000).  Furthermore, an employer is not liable for alleged harassment if it can show it took prompt, remedial measures to stop

---

[3] Claims under the MHRA are analyzed similarly to claims for Title VII except that under the MHRA, the plaintiff has an additional burden of establishing that the conduct she was subjected to was unwelcome "*sexual conduct*."  *See Danz*, 263 N.W.2d at 398-99 (Minn. 1978); *Sigurdson*, 386 N.W.2d at 719; *Goins v. West Group*, 635 N.W.2d 717, 725 (Minn. 2001).

and prevent any future harassing behavior.  *Id.*  Smith's harassment claim must be dismissed.

**A.   There Is No Evidence Smith Was The Subject Of Unwelcome Sexual Conduct.**

Smith's claim for sex harassment should fail as she has not presented evidence to show she was the subject of the unwelcome sexual conduct.  Rather, Smith's entire claim is based on what she saw when she opened the door to the Boardroom to ask whether she should close the bar.  It is undisputed Smith was not invited to the party nor did she announce to anyone she was coming into the Boardroom.  (Smith Dep. 136-40).  Smith simply entered the Boardroom where she allegedly saw inappropriate behavior from some of her co-workers.  (*See supra* Facts Section III).  According to Smith, other than the four individuals engaged in the alleged "sexual-type" acts, the other employees in the Boardroom were simply sitting and/or standing around, albeit drinking heavily.  (Smith Dep. 150-51, 174).  Smith denies anyone propositioned or touched her that evening and has not presented any evidence that the incident was discussed with her further by any co-worker and/or supervisor other than Bezdicheck.  (Smith Dep. 148-49, 155).  There is absolutely no evidence that *Smith was subjected to unwelcome harassment*.  She merely walked into a room, and in less than eight seconds, saw some questionable behavior but admittedly she did not have the time to "study the room."  (Smith Dep. 174).

**B.   Smith Fails To Present A Triable Issue of Fact to Show The Alleged Harassing Conduct Affected a Term, Condition, or Privilege of Employment.**

Smith's hostile environment claim further fails because there is no evidence to

establish the alleged harassing conduct affected a term, condition, or privilege of her employment.   In analyzing this element of harassment, courts consider the following factors:

- the frequency and severity of the discriminatory conduct;
- whether it is physically threatening or humiliating or only an offensive utterance;
- whether it unreasonably interferes with the employee's work performance, physical proximity to the harasser; and
- the presence or absence of other people.

*Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999) (internal citations omitted). Courts apply these standards to ensure only conduct that is "extreme" will be deemed to amount to a change in the terms and conditions of employment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Smith has not presented evidence that the discriminatory conduct was frequent or severe.  Although for purposes of summary judgment all reasonable inferences must be given to the non-moving party, Smith's testimony that she was in the room for one minute is contradicted by surveillance tapes that show Smith opened the door to the Boardroom on August 30th for less than eight seconds before walking away.  (Marshall Decl. Ex. D, Clips 19-20).  Eight seconds, over eighteen months of employment, cannot establish severe or pervasive harassment as a matter of law.  *See Alagma v. Smithville R-II*, 324 F.3d 975 (8th Cir. 2003) (finding a male's inappropriate behavior towards a female colleague extending beyond two years and including behavior such as saying "I love you", commenting on the colleague's appearance, calling her repeatedly at her home, physically touching her, and giving her gifts such as romance novels, was not severe or

pervasive); *see also Duncan v. GMC*, 300 F.3d 928, 931-35 (8th Cir. 2002) (finding no severe or pervasive harassment where for three years, a female employee was subjected to inappropriate behavior such as a co-worker propositioning her for a relationship, physical contact, visible pornography, poster depicting the plaintiff in a negative manner).

Furthermore, Smith cannot establish the conduct she witnessed interfered with her working conditions or performance. Smith continued to work with those same employees she saw present in the Boardroom that evening, without incident. (Smith Dep. 167). Moreover, Smith admits she did not suffer any change in pay, hours or position after witnessing the acts of August 30th. (Smith Dep. 232). Although Smith alleges "nobody talked to [her] anymore" and she felt "isolated" after August 30th and her subsequent report, there is no evidence to even create an inference that the different treatment, if true, was caused by the events of August 30th. (Smith Dep. 215).

**C.    Smith's Claims Must Also Fail As Hilton Took Prompt, Remedial Measures to Correct and Prevent Harassment.**

Smith also alleges Hilton failed to take prompt, remedial action to her complaint of harassment. (Smith Dep. 228-29; 2nd Am. Compl. ¶ 1). However, her own testimony belies the allegations in her Complaint. Smith testified:

> Q: Okay, now turning to Paragraph No. 11, there's no 10 in your complaint, but they're going to paragraph 11. It says, "Plaintiff objected to the sexual [229] harassment and other misconduct …" Is that referring to the August 30?
> A: Yes.
> Q: Okay. Now, you allege that no prompt remedial action was taken and retaliation ensued?
> A: Yes.

18

Q:  Were you ever subjected to another room filled with an orgy?
A:  No, I was not.
Q:  Did you ever see any other sexual acts after August 30?
A:  No, I did not.
Q:  Were you ever propositioned by anyone at the Hilton after August 30?
A:  No, I was not.

(Smith Dep. 228:23-25, 229:1-18).  Smith further testified that she bases this allegation on the fact she "never during the whole time from that event forward saw anything happen at all" because she did not know Hilton had conducted an investigation and reprimanded the necessary employees.  (Smith Dep. 232).  Smith admits, however, it would not be appropriate for human resources to discuss disciplinary action of other co-workers with her and is now aware that several individuals, including Vennewitz, had, in fact, been reprimanded.  (Smith Dep. 232-34).

The undisputed facts establish Hilton has an anti-harassment policy and regularly provides training on its policy to its employees upon hire and thereafter annually.  (Smith Dep. 90-92; Smith Ex. 5; Schultz Dep. 14-16).  The undisputed facts also establish that, after receiving Smith's report during her disciplinary meeting on September 6th, Hilton's human resources department conducted a thorough investigation including conducting witness interviews and reviewing security tapes.  (*See supra* Facts Section VI).  As a result of the investigation, Hilton reprimanded many individuals who participated in the party.  (*Id.*).  Hilton further provided additional sex harassment training as a result of the investigation.  (*Id.*).

For these reasons, the Court should dismiss Smith's claim for sex harassment/hostile work environment as a matter of law.

## II.     SMITH'S REPRISAL CLAIM MUST BE DISMISSED.

Smith further alleges that she suffered from a "campaign of harassment and retaliation" that ultimately led to her termination in support of her reprisal claim under the MHRA (Count Two).   (2nd Am. Compl. ¶¶ 8, 27-30).   Smith alleges that after her report on September 6th, she was set up for retaliatory termination and fired.   (2nd Am. Compl. ¶¶ 8-9).   To survive summary judgment, Smith must establish:   (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse action. Minn. Stat. § 363A.15; *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn. 1999); *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983); *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007).   An employee must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation.   *See Buettner v. Eastern Arch Coal Sales, Co.*, 216 F.3d 707, 715 (8th Cir. 2000).   Even if an employee presents enough evidence to establish a prima facie case, he/she has the ultimate burden of presenting evidence of pretext.   Smith's allegations, however, cannot support a claim for reprisal because no triable issues of fact exist to establish a causal connection between her report and an adverse employment action or pretext.

Smith asserts she suffered from adverse employment actions because she was "harassed" and ultimately terminated.   However, she cannot establish either act was causally connected to her report.   Smith admits she did not oppose the alleged harassing behavior from August 30th until September 6th during the disciplinary meeting requested

by human resources.  (Smith Dep. 197-200).  The Corrective Action was prepared prior to the meeting when she made the report.  (Smith Dep. 191-92).  Smith also admits the performance issues addressed in the paperwork were all true.  (Smith Dep. 181-82, 186-87, 192-93).  As a matter of law, her suspension cannot be reprisal as she admittedly had not engaged in a protected activity *before* Hilton prepared to meet with her to address on-going performance issues.  Furthermore, there is no evidence Hilton had any knowledge about her alleged opposition to what she saw on August 30th until this same meeting.  As a matter of law, she cannot establish a causal connection between her report and suspension.

Finally, Smith admittedly did not report back from her medical leave of absence on December 15th, per her physician's certification.  (Smith Dep. 220-25; Smith Ex. 11).  Smith's physician's late certification provided on December 18th (three days after she should have returned), is immaterial because she did not return on December 18th or December 19th.  (Smith Dep. 220-25).  It was Smith who failed to return from leave or take the affirmative steps required of her to ensure her leave was extended and approved.  Per its policy, Hilton terminated Smith's employment after she failed to return to work when released for work by her physician.  (Smith Ex. 11 and Ex. 13 at pg. 11).  There is no evidence a causal connection exists between her report of alleged sex harassment and her termination.

Even if this Court determines she has presented sufficient evidence for a prima facie case based on timing alone, Smith's claim must still fail because she has not presented any evidence a triable issue of fact exists to establish the legitimate, non-

discriminatory reasons provided by Hilton for placing Smith on probation and terminating her employment is pretext for unlawful reprisal.  Smith admits the issues addressed in the Corrective Action were true and many had been discussed with her in the months prior.  (Smith Dep. 181-82, 186-87, 191-95, 237).  It is well-settled that an employee who complains about discrimination is not immune from being disciplined for misconduct or performance issues.  *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *Floyd v. Kellogg Sales Co.*, 1987 U.S. Dist. LEXIS 14243 *29 (D. Minn. Jan. 8, 1987) ("the fact that a charge of discrimination has been filed or threatened by an employee does not immunize the employee from being discharged because of inadequate performance or other nondiscriminatory reasons."); *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1037 (8th Cir. 2005) (burden does not disappear merely because she and the company had a "long and contentious" history).  In this case, pretext cannot exist since she admittedly did not come forward to report the behavior *until* she was in a meeting with human resources discussing her performance issues and policy violations.

Furthermore, there is no evidence to establish pretext as to her termination.  Hilton policy was clearly articulated and the Hilton provided the policy to Smith.  Smith alleges she heard from another Hilton employee that after she left the Boardroom on August 30th Vennewitz said he was going to have her fired.  (Smith Dep. 168).  Not only is the statement inadmissible hearsay, it is irrelevant as the undisputed facts show Vennewitz was not involved with or even consulted about, Smith's termination.  (Vennewitz Dep. 23-24; Smith Dep. 215).  Hilton followed its policy and terminated Smith for failing to return from her medical leave of absence.  No evidence exists to show Hilton's reason is

false or pretextual.  Even if the Court holds temporal proximity creates an inference of retaliation to establish a prima facie case, standing alone, it is not enough to defeat summary judgment.[4]  This Court should dismiss Smith's claim of reprisal discrimination as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Defendant Hilton Hotel Co. requests the Court dismiss Plaintiff Deborah Smith's Second Amended Complaint in its entirety.

Dated:  December 1, 2009              JACKSON LEWIS LLP


                                                    *s/Thomas E. Marshall*
                                                    Thomas E. Marshall  #155597
                                                    Gina K. Janeiro #0345337
                                                    225 South Sixth Street, Suite 3850
                                                    Minneapolis, MN  55402
                                                    (612) 341-8131

                                                    ATTORNEYS FOR DEFENDANT

---

[4] *Hubbard*, 330 N.W.2d at 445-46 (2 days between protected activity and termination not sufficient when it is the only evidence of retaliation); *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002) (holding that temporal proximity of 2 weeks established prima facie case, but without more, did not establish pretext "because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification."); *Gagnon v. Sprint Corp.*, 284 F.3d 839, 851-52 (8th Cir. 2002) (1 month between protected activity and termination not sufficient when only evidence of retaliation); *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 685 (8th Cir. 2001) (7 months between protected activity and termination insufficient when only evidence of pretext).  Smith offers no additional evidence of pretext.