1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MINNESOTA

3  ----------------------------------------------------------

4  Deborah Smith,

5

6            Plaintiff,

7

8  vs.                        Civil No. 08-6195 (MJD/JSM)

9

10  Hilton Hotels Corporation d/b/a

11  HHC-Hilton Minneapolis H&T,

12

13            Defendant.

14  ----------------------------------------------------------

15

16            DEPOSITION OF

17      DEBORAH ANN FORSETH SMITH

18      Taken Tuesday, June 23, 2009

19        Commencing at 9:01 a.m.

20

21

22

23

24     Job No: 200507

25     REPORTED BY:  ANDREA J. TUNGLAND, RMR, CRR, CLR

EXHIBIT
A

## 2

1       DEPOSITION OF DEBORAH ANN FORSETH SMITH, taken

2  on the 23rd day of June, 2009, commencing at 9:01 a.m.,

3  at the Fifth Street Towers Business Center Conference

4  Room, 150 South Fifth Street, Minneapolis, Minnesota,

5  before Andrea J. Tungland, Registered Merit Reporter,

6  Certified Realtime Reporter, Certified LiveNote Reporter,

7  and Notary Public of and for the State of Minnesota.

8        **********

9

10       APPEARANCES

11

12  On Behalf of the Plaintiff:

13     SHEILA DOKKEN, ESQ.

14     sjdokken@msn.com

15     LORI PETERSON & ASSOCIATES

16     700 Lumber Exchange Building

17     10 South Fifth Street

18     Minneapolis, Minnesota 55402

19     (612) 321-0606

20

21

22  (APPEARANCES continued on next page)

23

24

25

## 3

1  On Behalf of the Defendant:

2     KATHERINE C. BISCHOFF, ESQ.

3     bischoffk@jacksonlewis.com

4     JACKSON LEWIS, LLP

5     150 Fifth Street Towers

6     Suite 1450

7     150 South Fifth Street

8     Minneapolis, Minnesota 55402

9     (612) 341-8131

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 4

1       I N D E X

2

3  DEBORAH ANN FORSETH SMITH:        Page:

4  EXAMINATION BY MS. BISCHOFF ........................ 7

5  REPORTER'S CERTIFICATE ............................ 242

6

7  CONFIDENTIAL PORTIONS MARKED:  8 - 12; 34 - 38

8

9  OBJECTIONS: Ms. Dokken: 168, 175, 180, 206, 215, 230,

10  232, 233, 240

11  REQUESTS:  None.

12  INSTRUCTIONS NOT TO ANSWER:  None.

13  CERTIFIED QUESTIONS:  None.

14

15

16  SMITH DEPOSITION EXHIBITS MARKED:

17

18  EXHIBIT 1:   Deborah Smith resume

19        April 2006-present

20        [Bates HILTON-PL 0001-2] .............. 42

21

22  EXHIBIT 2:   10-7-05 LSI Personnel Action Notice

23        Termination Form

24        [Bates Kip's 0004-11] ................. 61

25

## 5

1  SMITH DEPOSITION EXHIBITS MARKED (Continued):

2

3  EXHIBIT 3:   3-17-06 resume and Employment Application

4        [Bates DS-PER 0058-51] ................ 78

5

6  EXHIBIT 4:   3-23-06 job offer letter

7        [Bates DS-PER 0053-54] ................ 85

8

9  EXHIBIT 5:   4-4-06 Harassment-Free Workplace Policy

10        [Bates DS-PER 0046, 0014] ............. 90

11

12  EXHIBIT 6:   11-3-06 Performance Review

13        [Bates DS-PER 0032-38] ................ 98

14

15  EXHIBIT 7:   2-1-07 Performance Review

16        [Bates DS-PER 0024-31] ............... 118

17

18  EXHIBIT 8:   Second Amended Complaint

19        Jury Trial Demanded (6 pp.) .......... 167

20

21  EXHIBIT 9:   9-6-07 Corrective Action Form

22        [Bates HILTON 0010-15] ............... 185

23

24  EXHIBIT 10:  9-11-07 Discussion Planner

25        [Bates HILTON 0007-8] ................. 189

2 (Pages 2 to 5)

**6**

1   SMITH DEPOSITION EXHIBITS MARKED (Continued):
2
3   EXHIBIT 11:  11-8-07 Request for Leave of Absence
4        [Bates DS-PER 0117-121] ............... 219
5
6   EXHIBIT 12:  11-7-07 Certification of Health Care
7        Provider
8        [Bates DS-PER 0113-116] ............... 221
9
10  EXHIBIT 13:  Team Member Handbook Leaves of Absence
11       [Bates DS-PER 0163-164] ............... 222
12
13  EXHIBIT 14:  12-5-07 Certification of Health Care
14       Provider
15       [Bates DS-PER 0124-125] ............... 222
16
17  EXHIBIT 15:  12-24-07 Unemployment Insurance Request
18       for Information
19       [Bates HILTON-PL 0123-124] ............ 224
20
21  EXHIBIT 16:  Plaintiff's Answers to Defendant's
22       Interrogatories to Plaintiff
23       Deborah Smith (16 pp.) ................ 238
24
25

**7**

1            PROCEEDINGS
2         DEBORAH ANN FORSETH SMITH,
3   duly sworn, was examined and testified as follows:
4            EXAMINATION
5   BY MS. BISCHOFF:
6       Q. Good morning, Ms. Smith.  My name is Kate
7   Bischoff.  I'm an attorney with the law firm of Jackson
8   Lewis, and I represent the Hilton Minneapolis in a case
9   that you brought against them, okay?
10      A. Okay.
11      Q. Today is your deposition.  And the purpose of
12  your deposition is to learn everything you know about
13  your claim, okay?  So from A to Z I'm trying to get at
14  all the information you have, okay?
15      A. Okay.
16      Q. Have you ever had a deposition taken before?
17      A. Yes.
18      Q. When?
19      A. Approximately a year ago.
20      Q. And what was the matter you had your deposition
21  taken for?
22      A. It was a personal injury lawsuit.
23      Q. And what was the injury?
24      A. To my left wrist from a car accident.
25      Q. When did the car accident occur?

**8**

1       A. May 15, 2004.
2       Q. Were you a driver or passenger?
3       A. Driver.
4       Q. And the other vehicle?
5       A. I'm not sure what you're asking, the other
6   vehicle.
7       Q. Did you initiate the lawsuit?
8       A. Yes.
9       Q. You were the plaintiff?
10      A. Yes.
11      Q. So you were hit?
12      A. Yes, ma'am.
13      Q. Okay.  So you were the driver in the other
14  vehicle?
15      A. Correct.
16      Q. Okay.  And has there been any result to your
17  case yet?
18      A. Yes, with that portion it was settled.
19         MS. BISCHOFF:  And I'm going to designate
20  this part of the deposition transcript confidential for
21  purposes of any settlement agreement.
22         MS. DOKKEN:  Thank you.
23      Q. (By Ms. Bischoff)  What did it settle for?
24      A. Fifty thousand.
25      Q. Fifty?

**9**

1       A. Fifty.
2       Q. Did you have any continuing medical costs
3   associated with the injury?
4       A. Yes.
5       Q. Who did you see to treat the injury?
6       A. Currently just my regular doctor, Dr. Young.
7       Q. Bruce Young?
8       A. Yes, Bruce Young.
9       Q. Have you had any surgery or anything?
10      A. Yes.
11      Q. When was the surgery?
12      A. I've had three.
13      Q. Three, okay.  When was the first one?
14      A. First one was 2006.
15      Q. Okay.  And what was that surgery?
16      A. To release the tendon inside of my wrist.
17      Q. When was the second surgery?
18      A. It was arthroscopic and it was in 2007.
19      Q. What month in 2007?
20      A. I know it was the fall.  I just don't -- I know
21  it was fall.  I don't recall the month.
22      Q. Okay.  Before or after the event leading to this
23  lawsuit?
24      A. No, wait.  2007.  That's not 2007.  I'm sorry.
25  It was 2006.

3 (Pages 6 to 9)

## 10

1  Q. 2006.
2  A. So I apologize.
3  Q. So you had two surgeries in 2006?
4  A. Yeah. One was to release the tendon. The other
5  was arthroscopic to search.
6  Q. Okay. And that occurred sometime in the fall?
7  A. Yes.
8  Q. And there's a third surgery?
9  A. I missed the first one, which was in 2005. And
10  it was the same. It was the tendon release.
11  Q. Any other surgeries?
12  A. Not related to the car accident.
13  Q. Okay. And then there's a surgery in late
14  November or December of 2007?
15  A. No. Oh --
16  Q. Not on your wrist but there's another --
17  A. On my ankle, yes, ma'am. On my ankle, um-hum.
18  Q. And that's not related to the car accident?
19  A. Not that we could say, no.
20  Q. Did you want it to be part of the accident?
21  A. No.
22  Q. Any other depositions?
23  A. That's the only thing.
24  Q. Okay. How long did your deposition last
25  approximately a year ago?

## 11

1  A. Two and a half hours.
2  Q. I can't promise to be that fast. And was the
3  settlement part of some insurance proceeds you received?
4  A. It was from the insurance company, yes.
5  Q. Did you sue your insurance company or the other
6  driver's insurance company?
7  A. Currently doing my insurance company. Current.
8  That case was for the other insurance company.
9  Q. Okay. So you have two separate lawsuits from
10  the car accident?
11  A. Yes, there's two separate. One is completed.
12  The other one just began.
13  Q. And when did the other one against your
14  insurance company begin?
15  A. I would say it would have to be the fall of '08.
16  Q. And who is the defendant in that case?
17  A. Met Life.
18  Q. And why are you suing Met Life?
19  A. Underinsured motorist.
20  Q. So the other driver was underinsured so you're
21  seeking additional benefits from your insurance company?
22  A. Yes, ma'am.
23  Q. And what is the status of the lawsuit against
24  Met Life?
25  A. Interrogatories have been taken and a court

## 12

1  date -- I don't remember how they word this, but it's on
2  docket or something where it can move. It's between
3  three days and they're trying to get it locked in for
4  February of 2010.
5  Q. And that you believe is for a trial date?
6  A. Yes.
7  Q. And who was the lawsuit against that you just
8  recently settled?
9  A. American Family.
10  Q. Do you anticipate your deposition will be taken
11  in the Met Life case?
12  A. I anticipate this.
13  Q. Do you have any continuing emotional distress
14  damages coming out of the American Family lawsuit?
15  A. Not really. Just -- no.
16  Q. Is a portion of the settlement amount you
17  received in the American Family lawsuit attributable to
18  emotional distress?
19  A. No.
20  Q. Well, now that we're approximately 15 pages in,
21  let's go through the guidelines for a deposition, okay?
22  It's important that you give me audible answers.
23  Andrea's going to be taking everything down that's said
24  in the room so nods of the head and shrugs aren't heard
25  so they can't really be taken down in the transcript. So

## 13

1  audible answers, okay?
2  A. Okay.
3  Q. Next, it's important for us not to speak over
4  each other, for the same reason, we want a clear
5  transcript. So I will do my best not to interrupt you if
6  you do your best not to interrupt me, okay?
7  A. Okay.
8  Q. Next, I am bound to ask ambiguous, vague and
9  stupid questions, okay?
10  A. Okay.
11  Q. If I ask one of those, please ask me to clarify
12  because I'm going to assume that if you answer a
13  question, you understood it, okay?
14  A. Okay.
15  Q. Next, if you need to take a break, please let me
16  know and I'll do my best to give you a break at that
17  point. The only thing I'm really truly going to ask is
18  that you answer the question that's pending before you,
19  okay?
20  A. Okay.
21  Q. Now, in preparation for your deposition did you
22  speak with anyone besides Ms. Dokken or Ms. Peterson?
23  A. No.
24  Q. Okay. Did you review any records?
25  A. Yes.

4 (Pages 10 to 13)

VERITEXT CORPORATE SERVICES (800) 567-8658

14

1    Q.  Did you review records at the direction of
2  counsel?
3    A.  Yes.
4    Q.  Did you review any records on your own?
5    A.  No.
6    Q.  Did you do anything else to prepare for this
7  deposition today?
8    A.  Just thought.
9    Q.  Okay.  Well, hopefully I'll get at what you
10  thought about.  Did you think about anything in
11  particular that you remember?
12    A.  Just the day, the events.
13    Q.  What about the events?
14    A.  Just, you know, how I felt, what all transpired.
15  In a sense, I was reliving that in my mind.
16    Q.  Okay.  Let's talk a little bit about your
17  background, okay?
18    A.  Okay.
19    Q.  You are recently divorced?
20    A.  Yes, ma'am.
21    Q.  From Matthew Alan Smith?
22    A.  That's correct.
23    Q.  You are four years older than Mr. Smith?
24    A.  That's correct.
25    Q.  How long had you been married to Mr. Smith?

15

1    A.  July 2 would make it 17 years, 16 years.  I'm
2  sorry.  16 years.
3    Q.  Maybe that's why you're divorced.  I'm just
4  kidding.  When did you get married?
5    A.  1994, July 2.  Not sure if I got the math right
6  there.
7    Q.  That's okay.  How many kids do you have with
8  Matthew?
9    A.  Four.
10    Q.  And what are their names?
11    A.  Dylon and Dakota, Mickaila, Derek.
12    Q.  In that order?
13    A.  Um-hum.
14    Q.  Yes?
15    A.  Yes.
16    Q.  How old is Dylon?
17    A.  Dylon is 16.
18    Q.  And Dakota?
19    A.  13.
20    Q.  Mickaila?
21    A.  11.
22    Q.  And Derek?
23    A.  Seven.
24    Q.  How many times have you been pregnant?
25    A.  Five.

16

1    Q.  Have you -- was the fifth pregnancy between
2  Dylon and Derek?
3    A.  It was -- yes.
4    Q.  Have you ever had an abortion?
5    A.  No.
6    Q.  Did you have an abortion in 1980?
7    A.  Oh, yeah.  Yeah, I did.
8    Q.  Did you have another one in 1983?
9    A.  Yes, ma'am.
10    Q.  And how old were you at the time in 1980?
11    A.  '80 I would be 14.
12    Q.  And how old were you in 1983?
13    A.  '83 I would be 19, 18.  18.  No, 19.  I would be
14  19.
15    Q.  Any other pregnancies?
16    A.  The two abortions, my four babies, the one I
17  lost.  There might have been another abortion.  Sorry.
18  That's a tender subject.
19    Q.  No, I understand.  Now, your divorce with
20  Matthew, would you describe it as difficult?
21    A.  Yes, ma'am.
22    Q.  Why?
23    A.  Matt wanted to basically fight every step of the
24  way.  We each wanted the children.
25    Q.  Okay.  What is your current custody arrangement

17

1  with Mr. Smith?
2    A.  I have full permanent legal and sole custody of
3  our children, and he has parenting time.
4    Q.  And how much parenting time does he get?
5    A.  He has three hours every Wednesday and Thursday,
6  every other weekend, and he also gets -- we split
7  holidays equally throughout the year.  And then he also
8  has opportunity for vacation time up to a week.
9    Q.  Does he -- this is going to sound strange and I
10  don't mean it to sound strange, but does he split the
11  kids or does he get all four at the same time?
12    A.  He generally gets all four at the same time.
13    Q.  Okay.  Did you seek counseling for assistance
14  with the divorce?
15    A.  Yes.
16    Q.  And who do you see for that?
17    A.  Jennifer Webb.
18    Q.  And how often do you see Ms. Webb?
19    A.  Generally once a week, but there are times that
20  I go twice a week.  Many times.
21    Q.  And when did you start that?
22    A.  Gosh.  January or February of '08.
23    Q.  Okay.  And was the divorce the primary reason
24  you went and saw Ms. Webb?
25    A.  No.  Kind of a series of things.  The result of

5 (Pages 14 to 17)

## 18

1  the loss of my job, going through my divorce, which was
2  very difficult, trying to overcome the abuse that went on
3  in my home.
4      Q.  When you say abuse, what do you mean?
5      A.  My husband is verbally and physically abusive.
6      Q.  And has he ever hurt you?
7      A.  Yes, ma'am.
8      Q.  How?
9      A.  Hit me in the head, slapped me with a milk
10  carton, choked me, kicked me.
11      Q.  Did you seek medical attention for any of those
12  injuries?
13      A.  No.
14      Q.  How much time do you spend in your counseling
15  sessions talking about your divorce and your children?
16      A.  I would say it's a fair portion.  Probably 75
17  percent of the time.
18      Q.  And what consists of the other 25 percent?
19      A.  Sometimes I talk about work or my past, my
20  current work, my past work, my past in general.
21      Q.  Okay.  And what percentage of the 25 would you
22  say is attributable to this lawsuit?
23      A.  Maybe five to seven percent perhaps, if that.
24      Q.  Okay.  Did you ever tell Ms. Webb that you
25  believe this lawsuit is worth $2 million?

## 19

1      A.  No, ma'am.
2      Q.  If Ms. Webb's notes indicate that, would you say
3  that she wrote that down in error?
4      A.  Yes.
5      Q.  Now, beyond your ankle surgeries and your wrist
6  surgeries, do you have any other surgeries that you've
7  had?
8      A.  Yes, I've had surgeries.
9      Q.  For what?
10      A.  I've had -- way back when I was a little girl I
11  was bit by a dog, I had plastic surgery on my eye.  I
12  would say I was ten years old.
13      I had to have my tonsils removed when I was 18.
14      I had my appendix removed when -- I have to
15  think now.  1996 I had my appendix removed.
16      I've had teeth extracted.  When I was 12 I had
17  several teeth extracted and then wisdom teeth out when I
18  was 12.
19      Q.  Any other surgeries?
20      A.  That's why I'm thinking.
21      Q.  That's okay.  Take your time.
22      A.  I don't think so.  I don't recall any others.  I
23  know those for sure.
24      Q.  Okay.  Have you ever had any colorectal surgery?
25      A.  Not a surgery.  I had a colonoscopy but not a

## 20

1  surgery.  I've had procedures done on hemorrhoids and I
2  don't know that they would be considered surgery because
3  they just did a local in the area, and those were due to
4  pregnancy.  I've had them lanced, essentially is the word
5  they've used.
6      Q.  Do you have ongoing treatment for hemorrhoids?
7      A.  I've seen a doctor about three times, or two
8  times for sure, Dr. Steadland, in the last two to three
9  years here.
10      Is there treatment that I'm doing?  I just --
11  changing my diet, drinking a lot of water, that type of
12  thing, trying to avoid surgery.
13      Q.  Do you attribute anything that happened in this
14  lawsuit to your hemorrhoids?
15      A.  I had a lot of stress in my life, which causes
16  me to get an upset stomach, so yes, partially.
17      Q.  When you say partially, what do you mean?
18      A.  I would say that the hemorrhoids came from my
19  children, but the fact that I had diarrhea constantly the
20  whole time that all of this was going on, and causing
21  them to bleed, is a result.
22      Q.  When you say all of this going on, what do you
23  mean?
24      A.  I mean there was quite a bit of turmoil and
25  anxiety created in my workplace from the moment that I

## 21

1  opened the door.  And I'm referring to the boardroom.
2      Q.  No, I get that.
3      A.  Okay.
4      Q.  If you had to put a percentage of cause to your
5  hemorrhoids, what percentage would you give to the
6  incidents involved in this lawsuit?
7      A.  Probably 50 percent.
8      Q.  You have a history of depression?
9      A.  I would assume so, yes.  Yes, I'm sure that --
10  I've talked to doctors several times so yes.
11      Q.  And what were the causes in your mind of the
12  depression?
13      A.  A variety of reasons.  Part of it is some things
14  that happened in my childhood.
15      Q.  Like what?
16      A.  Sexual abuse when I was eight, so dealing with
17  that.  My relationship with my husband, the nature of
18  what I do for a living, being a restaurant manager,
19  having four kids.
20      Q.  Tell me about the sexual abuse when you were
21  eight.
22      A.  All right.  My brothers' friends sexually abused
23  me over a summer.
24      Q.  Does it still affect you today?
25      A.  Not on the same level as it did.  It's something

6 (Pages 18 to 21)

VERITEXT CORPORATE SERVICES (800) 567-8658

22

1    that I've worked through, but my husband re-offended, so
2    it brought a lot of that back for me.
3        Q. When you say re-offended, what do you mean?
4        A. My husband sexually assaulted me many times.
5        Q. Did this sexual assault at the hands of your
6    husband occur at the end of your marriage?
7        A. Yes, ma'am.
8        Q. And when did you and your husband separate?
9        A. November 1 of 2007.
10       Q. Approximately seven weeks before your
11   termination?
12       A. That's correct.
13       Q. What do you mean by the nature of your job
14   causing depression?
15       A. A restaurant manager job can be a stressful
16   position to have. It is. You need to wear several hats,
17   you deal with the public, you deal with your staff. You
18   also have shareholders and people who own your company
19   that you're accountable to as well. So it's nothing you
20   can predict in a restaurant. You can have a history and
21   no numbers but you cannot absolutely know when 100 people
22   are just going to show up. So you need to be on point,
23   on cue at all times.
24       Q. And that causes you depression symptoms?
25       A. Well, it causes stress which can lead to

23

1    depression if you don't feel you're doing all right.
2        Q. And what about your four kids causes depression?
3        A. Most of that would stem just from the
4    relationship with my husband. I really thought if I
5    stayed with him I was doing the right thing for them.
6    And he's verbally abusive towards them as well, so it's
7    depressing to know -- and it is -- it affects me that my
8    children have been so deeply affected by this. I thought
9    I was protecting them and I didn't. So they have issues
10   as well.
11       Q. What do you mean, they have issues?
12       A. They're depressed that we're apart.
13       Q. Did either of your -- or did any three of your
14   boys ever express a desire not to be with you?
15       A. Yes, one of them did.
16       Q. Which one?
17       A. Dakota.
18       Q. Dakota wanted to be with your husband?
19       A. Correct.
20       Q. Do you call him Cody?
21       A. Yes.
22       Q. Okay. I thought I heard that earlier so I just
23   wanted to make sure that was right.
24       A. They all have nicknames. That's right.
25       Q. I'm Katherine.

24

1        A. I'll try to clarify that.
2        Q. Did Dakota wanting to be with your husband and
3    not you cause depression-like symptoms?
4        A. Yes. It's very upsetting, yes.
5        Q. And when did this occur?
6        A. When we were doing the evaluation process last
7    summer.
8        Q. Were your children assigned a guardian ad litem?
9        A. No.
10       Q. Then what do you mean by evaluation process?
11       A. There's an evaluator that works for the Anoka
12   County court system. We tried mediation to begin with
13   and was -- that didn't work. So then we were recommended
14   to go through an evaluator.
15       Q. What was the name of the evaluator?
16       A. I should know this too. Marsha Young.
17       Q. And did Cody tell Ms. Young that he wanted to be
18   with Matthew Smith?
19       A. Yes.
20       Q. Is there any other, besides the sexual abuse,
21   your ex-husband, the nature of your job and the four kids
22   that causes you depression-like symptoms?
23       A. I don't know. No. Just all of that.
24       Q. Okay. You also have a history of anxiety?
25       A. I guess, yeah. I didn't know anybody was

25

1    deeming it that so that's fine.
2        Q. Okay. Oh, I'm sorry. Backing up. You have
3    been prescribed medication for your depression at some
4    point?
5        A. Yes.
6        Q. Are you continuing to take that medication?
7        A. Yes, um-hum.
8        Q. Are you on that medication today?
9        A. Yes.
10       Q. And what is that medication?
11       A. Wellbutrin.
12       Q. What is your dosage today?
13       A. I don't know. I should know but I don't. I
14   apologize. I don't.
15       Q. Does it help?
16       A. I think so, yeah.
17       Q. How does it help?
18       A. I just -- I feel calmer. I don't feel as revved
19   up inside. My mind tends to think a lot. I don't cry as
20   much.
21       Q. When you say you're not crying as much, if you
22   were not on the Wellbutrin would you be crying more?
23       A. I don't think that I would because my life is in
24   such a different place today than it was.
25       Q. A better place?

7 (Pages 22 to 25)

26

```
 1      A. Yes, ma'am.
 2      Q. When did it become a better place?
 3      A. The minute Matthew moved out of the house, and
 4   spending the last year from '07 through '08 going to
 5   counseling and dealing with everything that's happened,
 6   from Matt to the Hilton. So I just know I'm in a better
 7   place. I feel more centered.
 8      Q. Now, you said that you see Ms. Webb once, maybe
 9   twice a week?
10      A. Um-hum.
11      Q. Yes?
12      A. Yes. I'm sorry. I know I did.
13      Q. I'm just monitoring.
14         MS. DOKKEN: It happens a lot.
15         THE WITNESS: That's good.
16      Q. (By Ms. Bischoff) Even when I'm in Sheila's
17   spot I'm on the witness. Normal thing to happen. What
18   determines when you see her twice a week?
19      A. My anxiety levels at times -- a lot of times my
20   life will dictate when I can go. I'm a very busy person.
21   I am essentially a single mother. I work and so I have
22   four kids I drive to and from school, so it's not like I
23   can just go whenever.
24         There was -- when I was healing my foot from my
25   surgery, when I was, you know, looking for a job, I was
```

27

```
 1   able to go at more intermittent times because the kids
 2   would be in school, and I could maybe pop in and see her
 3   before those kids came home, but that's not the case
 4   right now so...
 5      Q. Has Ms. Webb made any diagnoses of you to your
 6   knowledge?
 7      A. I believe so, yes.
 8      Q. What is the diagnoses?
 9      A. I don't know exactly the right terms. It's
10   traumatic stress disorder or something like that, along
11   that line.
12      Q. Does post-traumatic stress --
13      A. That probably sounds more right, yes.
14      Q. Okay. And has she attributed what the post-
15   traumatic stress incident is?
16      A. The domestic abuse that occurred in my family,
17   and the other stresses in life. Jobs, my experience with
18   the Hilton and other experiences I've had throughout my
19   life.
20      Q. Have you asked Ms. Webb to give you an
21   evaluation of the effect of the stress you received from
22   the Hilton?
23      A. No, ma'am.
24      Q. Again, if that is in Ms. Webb's notes would her
25   notation be incorrect?
```

28

```
 1      A. I don't know that I've asked her to like
 2   evaluate that, so I know I didn't ask her to do that so I
 3   don't know what she would have written. I guess I'm
 4   unsure what you mean.
 5      Q. Has Ms. Webb given you an evaluation for your
 6   custody arrangement?
 7      A. Yes. She didn't give it personally to me. It
 8   was given to the court system, which then I've been able
 9   to read because of all the documentation that comes from
10   them.
11      Q. And is it your belief that her evaluation is
12   correct?
13      A. Yes.
14      Q. Were you diagnosed with HPV in September of
15   2008?
16      A. Yes, ma'am.
17      Q. By who?
18      A. By a gynecologist, but I don't remember which
19   doctor it was. Oh, actually at first it was Dr. Young
20   who did a regular exam on me, and then so it was just a
21   yearly exam. And then the findings came back with
22   elevated levels, and then I went to see a gynecologist at
23   Women's Health, and that's in Coon Rapids.
24         MS. BISCHOFF: Sheila, I'm not sure we have
25   an authorization for Women's Health.
```

29

```
 1         MS. DOKKEN: Just send one over and we'll
 2   get it signed.
 3      Q. (By Ms. Bischoff) What kind of treatment have
 4   you had for that?
 5      A. I had a colposcopy.
 6      Q. What is that?
 7      A. They snip off part of your cervix.
 8         MS. DOKKEN: That sounds lovely.
 9         THE WITNESS: That's nice.
10      Q. (By Ms. Bischoff) And when did that occur?
11      A. Shortly after the diagnosis.
12      Q. Do you remember when that -- so sometime in
13   September-October of 2008?
14      A. Yes.
15      Q. Was that diagnosis troubling to you?
16      A. Yes.
17      Q. How so?
18      A. It's HPV. It's a virus that could give you
19   cervical cancer so it's concerning. It's scary to me.
20      Q. Have you had any ongoing treatment beyond the
21   snip?
22      A. Yeah, I had to go back. Just recently I was
23   back two months ago, I would say, for a follow-up
24   appointment where they do a regular smear and the levels
25   are lower, but...
```

8 (Pages 26 to 29)

**30**

1 Q. Still not gone?

2 A. Correct.

3 Q. Any other treatment for HPV?

4 A. No.

5 Q. Are you on any other medications?

6 A. I take other meds, yes.

7 Q. What are the other meds?

8 A. Okay. I take Nasonex, Patanol. Loratadine,

9 which is Claritin, bupropion. It's not that. That's the

10 Wellbutrin. Bupropion, that's the Wellbutrin that's

11 generic. There's something I take for my stomach. It's

12 ora-something. I should know.

13 Q. Any other ones?

14 A. I take fiber pills with calcium. That's kind of

15 my regimen I take on a daily basis. I was on some

16 sleeping pills but I don't take them very often, Ambien

17 CR. I do have a muscle relaxer, and I don't remember

18 what that's called either. I don't take that really at

19 all. It's just there in case I clench my jaw too much.

20 Q. Which of the medications you just described are

21 you on today?

22 A. The Wellbutrin or the bupropion, the stomach.

23 It starts with an O. I apologize. The Nasonex, the

24 Claritin, the Patanol and the fiber pills.

25 Q. The Nasonex and the Claritin are for sinus

**31**

1 issues?

2 A. Yes.

3 Q. For allergies?

4 A. Yes.

5 Q. Do you know what you're allergic to?

6 A. Yes.

7 Q. What?

8 A. Mold, dust. Those are the two biggest ones. I

9 have food allergies, onions, green peppers.

10 Q. Okay. The Patanol, what is that for?

11 A. Also for allergies.

12 Q. When were you diagnosed with these allergies?

13 A. I don't even remember. I tested quite some time

14 ago, five years ago, and I'm guessing. I really don't

15 recall exactly.

16 Q. Does Dr. Young oversee your treatment for these?

17 A. Correct.

18 Q. And the stomach one that starts with an O, what

19 is that for?

20 A. That's for reflux.

21 Q. And you took that one today?

22 A. Yes.

23 Q. And when were you diagnosed with reflux?

24 A. Dr. Young diagnosed me I think in fall of '07.

25 Q. Did the -- in the fall of '07 when he diagnosed

**32**

1 you with reflux, did the treatment he provided you in the

2 fall of '07 help?

3 A. The first -- he gave me a different medication

4 originally, which didn't work as well as this one. I was

5 taking over-the-counter meds prior to all of that, and I

6 was also taking an irritable bowel syndrome thing for

7 quite some time.

8 Q. And when did the IBS treatment begin?

9 A. I started doing it in the fall of '07.

10 Q. And when did the treatment end?

11 A. I ended it last summer, so summer of '08.

12 Q. And why were you taking IBS medication?

13 A. For the diarrhea. I had severe diarrhea.

14 Q. What do you attribute the diarrhea to?

15 A. Stress.

16 Q. From the demise of your marriage?

17 A. And the Hilton, my job.

18 Q. Are you claiming that you've been physically

19 injured because of the actions of the Hilton?

20 A. I mean, that's pretty physical, yes. I guess

21 so, yes.

22 Q. And the IBS has gone away?

23 A. Well, it's not totally gone but yes, it's very

24 much under control.

25 Q. Since the summer of '08?

**33**

1 A. Yes. I have bouts with it now and again but

2 it's much better.

3 Q. And do you attribute the end of it to increasing

4 the fiber in your diet?

5 A. Partially, and just lowering stress in my life.

6 Q. Now, the muscle relaxer, what is that diagnosed

7 for, or prescribed for?

8 A. When I'm stressed or when I'm nervous about

9 things I tend to clench my jaw.

10 Q. And when was it first prescribed?

11 A. It's got to be the fall or winter, so fall of

12 '08 or just beginning of '09 here.

13 Q. And you don't take that very often?

14 A. Really never. I should get rid of it really.

15 Q. And the sleeping pills, the Ambien CR, when was

16 that first prescribed?

17 A. '07, approximately November of '07.

18 Q. And why was it prescribed?

19 A. I wasn't sleeping.

20 Q. Why weren't you sleeping?

21 A. From stress from my marriage and stress from the

22 Hilton.

23 Q. Have you ever been told you've been diagnosed

24 with a situational stress disorder?

25 A. I haven't been told that. It could very well

**34**

1  exist, though.
2  Q. Okay. Have you ever been told you have an
3  alcohol problem?
4  A. No.
5  Q. Have you ever sought alcohol treatment?
6  A. Treatment when I -- well, I was forced into
7  treatment when I was a little girl, when I was 14, drug
8  treatment.
9  Q. When you went to drug treatment were you taking
10  drugs?
11  A. When I was 14, yes.
12  Q. What kind?
13  A. Marijuana, speed. I don't know what -- all I
14  know it by is speed or the little black beauties. That's
15  what they called it.
16  Q. Anything else?
17  A. I had done drugs, yeah. I had done cocaine, I
18  had done, yeah, alcohol before that but I didn't drink
19  after I was 13, which sounds sad.
20  Q. Any other times you've been in drug or alcohol
21  treatment?
22  A. Not drug or alcohol treatment.
23  Q. Any other kind of treatment?
24  A. Behavior treatment.
25  Q. When?

**35**

1  A. 13.
2  Q. And for what?
3  A. I was a truant in school, and worked with a
4  truant officer and there was a hearing. I sat in the
5  room and swore at the judge, and I was put immediately
6  into Golden Valley Health Center.
7  MS. DOKKEN: Just for purposes of
8  confidentiality, I just want to mark the portion
9  regarding your juvenile history of these things as
10  confidential. Okay. You can continue. I'm sorry.
11  Q. (By Ms. Bischoff) You said the Golden Valley
12  what?
13  A. Health Center.
14  Q. And how long were you there?
15  A. Six months.
16  Q. Was it residential, you were living there?
17  A. Yes.
18  Q. Why were you truant?
19  A. That's a good question. As a grown-up I've
20  figured it out but at the time -- I don't know if you
21  want to know now or then.
22  Q. Let's do both. What was it then?
23  A. Well, then it was -- I just wanted to decide my
24  own life and not have anyone tell me what to do.
25  Q. And what about now?

**36**

1  A. I understand that what I was doing was running
2  from pain. I'm also adopted so from the fact that I
3  never dealt with the sexual abuse until that age, I never
4  even talked about it until I was 13 until I was in that
5  center. So I was running from that and trying to deal
6  with it inside of myself with emotions I didn't even
7  understand because I was 13.
8  Q. After your residential treatment at the Golden
9  Valley Health Center did you have any other kinds of
10  treatment or residential --
11  A. Just the drug treatment that we just talked
12  about.
13  Q. And the drug treatment was when you were 14?
14  A. Yup.
15  Q. Where did you go for the drug treatment?
16  A. I think it was called Renaissance. I know it
17  was in Golden Valley. I think it was like a converted
18  house.
19  Q. Was it residential?
20  A. No, I didn't live there. It was an out-patient
21  program.
22  Q. After the -- both residential treatment and
23  Golden Valley Health Center and the treatment at
24  Renaissance or the place in Golden Valley, did you have
25  any other behavioral or drug issues?

**37**

1  A. No drug issues. Behavior issue, yes.
2  Q. What kind?
3  A. Well, we had just talked about the fact that I
4  was pregnant when I was 14 so that was one. You needed
5  parental consent at that time to have an abortion done.
6  And I left home when I was 15, and I never returned.
7  Q. Who did you live with?
8  A. A 36-year-old man named Bruce.
9  Q. Was Bruce a relative?
10  A. No, ma'am.
11  Q. What was Bruce's last name?
12  A. Gordon.
13  Q. G-O-R-D-O-N?
14  A. Correct.
15  Q. And where did Mr. Gordon live?
16  A. Crystal, Minnesota.
17  Q. How did you meet him?
18  A. Mutual friends.
19  Q. When you were 15 you had a mutual friend that
20  hooked you up with a 36-year-old?
21  A. Correct.
22  Q. And how long did you live with Mr. Gordon?
23  A. Three years.
24  Q. Was Mr. Gordon the father of any of your
25  pregnancies?

10 (Pages 34 to 37)

38

1    A. No.
2    Q. Who are?
3    A. A man that I met in California was the first one
4  with the 14-year-old. My mother, sister and I were on
5  vacation. This sounds really bad.
6        MS. DOKKEN: That's okay.
7        THE WITNESS: Scott Blackwell.
8    Q. (By Ms. Bischoff) Did he know?
9    A. Yes.
10   Q. Did you know him well?
11   A. No.
12   Q. The second?
13   A. I don't remember his name at all.
14   Q. Okay.
15   A. I think -- it might come to me so I can let you
16 know. I can see his face but I can't think of his name.
17   Q. Okay. If you remember, let me know.
18   A. Okay.
19   Q. In addition to your allergies you've had some
20 sinus trouble?
21   A. Yes. Quite a bit.
22   Q. Primarily when you're pregnant?
23   A. That's pretty much where it all began.
24   Q. Okay. Have you had any treatment for it besides
25 the allergy medications?

39

1    A. Yes.
2    Q. Like what?
3    A. We've had -- I was hospitalized in the beginning
4  when I was pregnant with Mickaila. I had to be
5  hospitalized because of my sinus issues. I had to be put
6  on -- I've been on several antibiotics throughout my life
7  since then, but I was on IV antibiotics and I had a brain
8  scan done at that time as well when I was eight months
9  pregnant.
10   Q. Do you mean a brain scan?
11   A. Yeah.
12   Q. You mixed the I and the A and said Brian scan.
13 I assume you don't have a Brian --
14   A. No.
15   Q. Any other treatment?
16   A. You know, lots of allergy, different allergy
17 meds throughout time. I did have that allergy testing
18 done where they poke.
19   Q. The grid and they poke?
20   A. Yes.
21   Q. Okay.
22   A. I've had some CAT scans, I think that's what
23 they're called, where they look at your sinuses. I've
24 seen ENTs.
25   Q. Any sinus surgeries?

40

1    A. No surgery.
2    Q. Now, you had a DWI?
3    A. Yes, ma'am.
4    Q. When?
5    A. It would be 11 years -- it will be 12 years ago
6  in October of this year. That will make it 12 years ago.
7    Q. October '09?
8    A. Yes. So 12 years prior to that.
9    Q. And when -- what were the circumstances of the
10 DWI?
11   A. My -- I had just given birth to my little girl
12 on the 6th of October. My best friend and I were
13 pregnant at the very same time. My best friend and I
14 were one week apart. I gave birth to my baby and I came
15 home from the hospital, and my best friend's baby died
16 and she gave birth to a stillborn.
17       And so I went to her house with my baby and we
18 cried and we repainted this nursery so it wouldn't make
19 her sad. And my baby slept in the crib that was for her
20 baby, and she held her and it helped. And I drank a
21 couple of beers over the course of this night.
22       And I got into the car with my daughter and I
23 drove home, and my daughter started to cry. I was on
24 White Bear Avenue. And she was crying and crying and her
25 seat, of course, is facing backwards behind me, and I

41

1  can't see her and she's screaming and crying and I don't
2  know why.
3        So I want to pull my car over so I go up to a
4  light and I go to pull over and of course it's the only
5  one-way there and I pull over right next to a police
6  officer.
7        So I was administered a breath thing,
8  Breathalyzer. Breathalyzer. And they took her and then
9  took me to the station, and then had me blow in a
10 machine. And then eventually after three or four hours
11 they let my husband come and take our daughter and take
12 me home, or then I got to see my daughter again.
13   Q. Did you have any treatment or any fines or --
14   A. Yes, there were fines. I -- I think it's kind
15 of standard but I did -- for me I did an alcohol
16 assessment test, I went to MADD classes, there were fines
17 and I paid that over time. I had lost my license for a
18 portion of time and had a work permit.
19   Q. Any other consequences?
20   A. Not that I recall. I mean, obviously within my
21 marriage, but legally, is that what you're asking?
22   Q. Yes.
23   A. No, not that I recall. I may have missed
24 something. It was a long time ago. I mean, it stays on
25 your record. I'm sure there's maybe probation or I don't

11 (Pages 38 to 41)

42

1  know. I didn't see anybody. I just paid these fines,
2  did what I was supposed to.
3       Oh. I had to go to the Anoka -- what do you
4  call it, work house thing for a weekend. That was part
5  of it.
6       Q. Okay. Anything else?
7       A. Not that I recall.
8       Q. Okay. Is this a good time for a break?
9            MS. DOKKEN: Sure.
10           (Recess taken between 9:50 a.m. and 9:59 a.m.)
11           (Smith Deposition Exhibit 1 marked for
12            identification by the Court Reporter.)
13      Q. (By Ms. Bischoff) Back on the record. Are you
14  ready?
15      A. Yes.
16      Q. I want to show you what has been marked as
17  Deposition Exhibit 1. Do you recognize this document?
18      A. Yes.
19      Q. And what is it?
20      A. It's my resume, Deborah Smith resume.
21      Q. Let's start with the second page of this
22  document. And the first -- the first job on there, which
23  is at the bottom of this list, because you do it in
24  reverse chronological order?
25      A. Yes.

43

1       Q. Is the Hotel Sofitel?
2       A. Yes.
3       Q. And you have a date August of 1994 to September
4  of 1997, right?
5       A. I have that, yes. That's what it says there.
6       Q. And is that the correct dates of employment?
7       A. I'm not sure.
8       Q. Okay. Are you using this resume today?
9       A. A similar thing. I mean, something similar.
10           MS. BISCHOFF: Can we go off the record
11  there?
12           (Discussion held off the record.)
13           MS. BISCHOFF: Back on the record.
14           MS. DOKKEN: Kate, do you happen to have
15  copies of those?
16           MS. BISCHOFF: Oh, I'm so sorry. I do.
17  I'm prepared.
18           MS. DOKKEN: That's okay.
19      Q. (By Ms. Bischoff) You have your job listed here
20  as restaurant manager. Was that the first position you
21  held at the Hotel Sofitel?
22      A. Yes.
23      Q. What was your positions before the Hotel
24  Sofitel?
25      A. Let's see. Before I worked at Sofitel I worked

44

1  for a company called Canteen of Minnesota.
2       Q. What was the position?
3       A. I was hired to be the catering director for
4  Medtronic's corporate headquarters.
5       Q. For Medtronic's?
6       A. Yes, ma'am.
7       Q. How long did you hold that position?
8       A. Approximately two years, two and a half years.
9  I was promoted in the middle of it to a different
10  position, so...
11      Q. What was the different position?
12      A. I was made food service director of Mahtomedi
13  School District.
14      Q. And why did you leave that position?
15      A. It was an awful job. It was five buildings, no
16  assistant manager, two different unions. Very, very,
17  very political.
18      Q. What do you mean by very political?
19      A. Even the interview process for the position was
20  done before the school board. And one thing you have to
21  do is in each building you have to make sure that the
22  principals are happy, and then you have to make sure that
23  all the hundreds and hundreds of parents are happy.
24  That's what I mean by it's -- political seems like the
25  right term to me.

45

1       Q. Was it a stressful job?
2       A. Yes. Yes, it was.
3       Q. What job did you have immediately after the
4  Canteen of Minnesota?
5       A. Then I worked at Sofitel.
6       Q. And how did you come to get the job at Sofitel?
7       A. I don't remember if I found it in the paper
8  or -- I'm thinking it was in the newspaper, though, and
9  then I just went. I called and I went down and applied
10  and interviewed. I remember applying because it was the
11  coldest day of the year.
12      Q. So winter?
13      A. It was. I think the dates are wrong. I'm sure
14  they are.
15      Q. And throughout the three-year period you were at
16  Sofitel were you the restaurant manager the entire time?
17      A. Yes.
18      Q. Why did you leave Sofitel?
19      A. I injured my back when I was pregnant with my
20  daughter, and I had to do a lot of physical therapy at
21  that time because I injured it while I was pregnant so I
22  had to wait until I gave birth to her before I could
23  really fix it.
24           And during that time it just became very
25  difficult. It became difficult to work. There was a

12 (Pages 42 to 45)

46

1  change, a shift in the upper management, meaning we had a
2  new GM and a new F&B director, and it just didn't feel
3  like the same place it was to me.  It was time for a
4  move.
5      Q.  Did you make the decision to leave by yourself?
6      A.  Yeah.  I mean -- yeah.
7      Q.  Did they ask you to leave?
8      A.  Yeah.  They wanted -- yeah, it was kind of a
9  mutual deal, um-hum.
10      Q.  Did they give you a reason as to why they wanted
11  you to leave?
12      A.  They thought that I just was angry, maybe.  I
13  don't remember the exact words.  It was a very long time
14  ago but...
15      Q.  Did they believe you had an attitude problem?
16      A.  That may have been it.  Yes, ma'am.
17      Q.  Did they give you any other reasons?
18      A.  Not that I'm recalling.
19      Q.  Your next position is an assistant general
20  manager position at Ground Round, correct?
21      A.  That's what it says.
22      Q.  Was that your next position?
23      A.  I was restaurant manager.
24      Q.  I'm sorry.  What?
25      A.  I was a restaurant manager.  It's just a

47

1  different title.
2      Q.  But the title the Ground Round had for it was
3  assistant general manager?
4      A.  Yes.
5      Q.  How did you come to find that position?
6      A.  Let me think now.  I don't know if it was
7  Internet or the unemployment office or it was one of the
8  three sources or the newspaper, and I really don't recall
9  which.
10      Q.  Do you remember how long you were unemployed
11  between Sofitel and Ground Round?
12      A.  It wouldn't have been real long, but I don't
13  recall.
14      Q.  Did you collect unemployment between the two
15  positions?
16      A.  No.
17      Q.  And you worked at the Ground Round for less than
18  a year?
19      A.  That's correct.
20      Q.  How did you like the position?
21      A.  I did not like the position.
22      Q.  Why not?
23      A.  They were going to re-concept the restaurant,
24  which means change it from a casual dining restaurant
25  into a more upscale venue, which was why I was brought in

48

1  there in the first place.  That's what allured me because
2  Sofitel is an upscale restaurant with linens and such.
3  They were going to transform to that, which would have never
4  transpired.  It was a sports bar with a lot of people
5  drinking after work.
6      Q.  Did you find that portion of it distasteful?
7      A.  Some distasteful things did happen, yes.
8      Q.  Like what?
9      A.  Acting like a bouncer.  One of my patrons was
10  taken outside by two other young patrons and they stomped
11  on his head until they broke all the bones in his face.
12  And then my general manager was arrested for holding a
13  shotgun to his girlfriend's head and then wanted me to
14  put my house up for collateral to get him out of jail.
15  That's when I decided it was time to quit.
16      Q.  And so did you leave there voluntarily?
17      A.  Yes.
18      Q.  It wasn't mutual, like the Hotel Sofitel was
19  mutual?
20      A.  Not at all.
21      Q.  Your next position after Ground Round was?
22      A.  Napa.  Yeah, I went to Napa.
23      Q.  And you were at Napa from September 29, 1998 to
24  June 2001?
25      A.  Yes.

49

1      Q.  So you had a period of unemployment of
2  approximately three months between the Ground Round and
3  Napa Valley Grill?
4      A.  Yeah.  It was approximately.  I don't think the
5  dates are right, but yes.
6      Q.  What dates are wrong?
7      A.  Well, I had already -- was working on the Napa
8  job when I left the Ground Round so I don't believe that
9  I have the months right.
10      Q.  How did you like the Napa Valley Grill position?
11      A.  I liked the Napa.  It was a great place.
12      Q.  And you were the assistant general manager?
13      A.  Yes.
14      Q.  And what -- Napa Valley Grill is in the Mall of
15  America, right?
16      A.  Correct.
17      Q.  And they're open quite late at night?
18      A.  Yes.
19      Q.  Did you work a particular shift day or night?
20      A.  No.  We had more of -- you have a rotating
21  schedule.
22      Q.  So you liked the job.  Did you have any
23  performance issues while you were at Napa Valley Grill?
24      A.  I don't think so, no.
25      Q.  Any discipline?

13 (Pages 46 to 49)

**50**

1   A.   Not that I recall.
2   Q.   Why did you leave the Napa Valley Grill?
3   A.   The people who owned Prima, the next job I go to
4   after this, is Jennifer and Elliott King.  They were the
5   regional director and the regional chef of Napa -- it's
6   California Cafe is really the owner.
7   Q.   Um-hum.
8   A.   So they did the whole nation.  They essentially
9   stole me out of there, for lack of a better term.
10   Q.   They enticed you to go to Prima?
11   A.   Yes.
12   Q.   And where was Prima?
13   A.   In Minneapolis.
14   Q.   Where?
15   A.   Off Diamond Lake Road and Lyndale, like -- well,
16   it's not 50th.  What is it?  It's Kenwood District right
17   there, right next to Kowalskis.
18   Q.   Does it still exist?
19   A.   Yes.
20   Q.   On this resume you say that you overlap from the
21   Prima Restaurant and Napa Valley Grill by approximately
22   four months; is that correct?
23   A.   Well, see, and again I know these are wrong.
24   The dates -- the months are wrong.
25   Q.   How are they wrong?

**51**

1   A.   I left Napa, gave a notice, left and immediately
2   started at.  So as you see, it looks like that didn't
3   happen.  I mean, it looks like I was working both places.
4   Q.   So you weren't working both places?
5   A.   No.
6   Q.   Like you had been for Napa and Ground Round?
7   A.   I never -- no.  That's what I'm saying.  The
8   dates are wrong.  The months are wrong.
9   Q.   Okay.  Did you like working at Prima?
10   A.   No.
11   Q.   Why not?
12   A.   Tough job, tough boss.
13   Q.   Who was your boss?
14   A.   Jennifer and Elliott King.
15   Q.   Hadn't you already been working for them for
16   Napa Valley?
17   A.   They were already gone and already had their
18   restaurant so they had worked there before for like the
19   first year I was at Napa, but then they left and opened
20   up their own restaurant, which was Prima, and they were
21   already running that.
22       And they were going to open a second restaurant
23   so they needed someone to come in and run Prima.  That
24   was the reason why they wanted me to come, because they
25   no longer were going to be in that building.  They were

**52**

1   opening Three Fish, actually.
2   Q.   And you found them tough.  How so?
3   A.   Tough boss.  She's tough.  I mean, she -- you
4   run it like it's yours.  If I had a dollar for every time
5   I was asked that, is this your restaurant kind of thing,
6   I mean, it's small, very small, very, very popular, so we
7   would do just a ton of people in an 80-seat restaurant
8   and I would be in a perpetual wait.
9       Just really high expectations from them, meeting
10   numbers and staying busy and pleasing clients, which is
11   all what you do as a restaurant manager.  It was just
12   very difficult.  Jennifer has a very set way of how she
13   wants things done, and you have to do it that way.
14   Q.   Did you have any performance issues?
15   A.   Yes, at the end.
16   Q.   Any disciplinary actions?
17   A.   Not -- I don't know that they were formal.  I
18   didn't -- she may have wrote something and put it in a
19   file, but it was more her yelling at me and that was
20   that.
21   Q.   Why did you leave Prima?
22   A.   She fired me.
23   Q.   Did she give you a reason?
24   A.   Yup.  She was sick of my -- I'm going to find a
25   different word other than the swear words.  She was just

**53**

1   sick of my crap, she said.  And that Hector and I had,
2   and I -- Hector was the chef there, left the door at the
3   same time.  I set the alarm.  He was supposed to key the
4   door.  I went up and did the money, which was up in a
5   different part of the building, and apparently the door
6   didn't get keyed.  Keyed, locked.  And those were her
7   reasons.
8   Q.   Was Hector terminated at the same time?
9   A.   Nope.  Just me.
10   Q.   The next position after that is Olive Garden?
11   A.   Um-hum.
12   Q.   Yes?
13   A.   Yes.  I'm sorry.
14   Q.   And did you go directly from Prima to Olive
15   Garden?
16   A.   I spent probably -- there's another -- there's
17   probably a month and a half gap that this is wrong again
18   with the months.
19   Q.   And there you were assistant general manager?
20   A.   Yes.
21   Q.   Again did you have a rotating schedule?
22   A.   Yes.
23   Q.   Did you like the Olive Garden?
24   A.   At first, yes, very much.
25   Q.   Did you hold the assistant general manager

14 (Pages 50 to 53)

**54**

1  position the entire time you were at the Olive Garden?
2      A. Yes, but you start as an MIT in the beginning so
3  you don't -- it's not traditional where you just walk in
4  like it was at Prima, where you walk in and they hand you
5  the keys and you run the store. There you go through a
6  six-week intensive MIT program.
7      Q. Management in training, you mean?
8      A. Yes. And then you spend six weeks at their
9  corporate office in Florida after that six-week period,
10  and then you come back and assigned your store, and then
11  you actually start to -- so you're getting paid that, you
12  have the title, but you're not functioning in that
13  capacity because as an MIT manager in training you have
14  to work your way through every position throughout the
15  restaurant, from cooking to making the soups to, you
16  know, all of it.
17      Q. And so how long did it take until you were
18  actually acting as the assistant general manager?
19      A. Gosh. I bet it was almost three months, you
20  know, like, yeah.
21      Q. You said at first you liked it. What happened?
22      A. I did not like the store I was assigned. I
23  really loved the place I trained and I think that
24  probably happens. I loved the group of people I was
25  working with over there. And even so, I just -- I just

**55**

1  did not care for some of the backwards things that were
2  going on in the restaurant I was assigned.
3      Q. What do you mean when you say backwards things?
4      A. I don't think it's appropriate to put salad
5  bowls on people who are of Asian descent and make them
6  walk around the restaurant, for instance.
7      Q. What do you mean?
8      A. The salad bowls that they use in the restaurant,
9  the general manager, Tad, placed them on the Asian
10  waitresses' heads and made them walk in the restaurant.
11      Q. Okay.
12      A. Which I reported to my district manager, but I
13  was also stolen from that job so that's why I left
14  really.
15      Q. Okay.
16      A. I had no doubt that that would be taken care of,
17  and I'm sure that it was. Just that I was being stolen
18  at the time so I ended up leaving.
19      Q. When you say taken care of, you mean that
20  practice of putting salad bowls on Asian's heads would
21  end?
22      A. Correct.
23      Q. And then you were stolen to The Melting Pot?
24      A. Correct.
25      Q. How did you meet David Adrian at The Melting

**56**

1  Pot?
2      A. I was -- Resources and Food and Food Team as a
3  recruiting. That's probably how I got some of my jobs,
4  now that I think about this. I used them I think to get
5  the job at the Ground Round. Maybe -- and maybe Napa as
6  well.
7          But I know for sure that Olive Garden, I had a
8  relationship with them, worked with them, and they're
9  recruiters for the restaurant industry, meaning you don't
10  pay them but they will help secure a position for you,
11  get you in front of employers. You go in and interview.
12  And if they do hire you, then I'm sure that the company
13  must get paid some portion from the company that you're
14  interviewing with.
15          So Resources and Food and Food Team had been
16  calling me and said we have the perfect position on our
17  desk for you. We thought of you right away. And that
18  was at The Melting Pot. Are you interested in talking.
19          And of course it's a general manager position,
20  which is, as your career is growing, that's absolutely
21  what I, anyway, wanted. It was a more night position,
22  because the restaurant is only open for dinner. And I
23  thought that would be much more ideal for our family
24  instead of me bouncing around hours. Child care is
25  difficult when you work in the morning one day and nights

**57**

1  the next. So that is how I got in front of The Melting
2  Pot.
3      Q. Okay. And did you like The Melting Pot?
4      A. Well, I really loved it. I loved the concept.
5  I -- it was the most exciting thing that I could have
6  ever done, but what I didn't like was my bouncing
7  paychecks. 22 bouncing paychecks is pretty much more
8  than anyone can take.
9      Q. So you left because the paychecks were bouncing?
10      A. Yes.
11      Q. Did you have any disciplinary issues while you
12  were at The Melting Pot?
13      A. No.
14      Q. Did you have any disciplinary issues while you
15  were at the Olive Garden?
16      A. No.
17      Q. Any performance issues at Olive Garden?
18      A. No.
19      Q. Any performance issues at The Melting Pot?
20      A. No, not -- I mean, my boss didn't always see eye
21  to eye with me. Really I worked with Kelly more than
22  David. I mean, David and I ran shifts together but Kelly
23  Bailey, his sister, was pretty much the one I worked
24  mostly with.
25      Q. So did you have any disagreements with them?

15 (Pages 54 to 57)

**58**

1    A. Over the paychecks, yes, especially near the
2  end, um-hum.
3    Q. Did you have any disagreements with your
4  performance or how you were running the restaurant?
5    A. No.
6    Q. So your paychecks were bouncing so you left The
7  Melting Pot?
8    A. Yes.
9    Q. You weren't stolen out of The Melting Pot?
10    A. Nope.
11    Q. Next you went to Kip's Irish Pub?
12    A. Yes.
13    Q. Where is Kip's Irish Pub?
14    A. St. Louis Park in the Marriott Hotel.
15  Considered the Marriott Southwest.
16    Q. Did you like that position?
17    A. I was very excited about it. I don't think --
18  in retrospect, no, I did not like it because I sold my
19  soul to the devil to do that job.
20    Q. What do you mean when you say that?
21    A. I went into a restaurant that was building, an
22  Irish pub that was building from the ground up. When I
23  went in it was cement floors and cement walls. The pub
24  was coming from Ireland and they were already four months
25  behind their time line with no one doing it.

**59**

1    So when I walked in they hadn't ordered POS,
2  they hadn't even begun to write menus, to begin manuals,
3  to do any of it. It was probably the single most
4  challenging successful thing I've ever done in my life,
5  but, yeah, it was a tremendous amount of work. And there
6  was no assistant manager. Just me. I got help from the
7  big company with marketing and those types of things. We
8  brought in a lot of people when we opened.
9    But against all the odds I did it, so I'm really
10  quite pleased with myself on that. We had to open on the
11  date that the owner wanted it open, so...
12    Q. Are the dates right on this resume?
13    A. The end date is wrong.
14    Q. Well --
15    A. The beginning date is wrong too because I
16  started in April.
17    Q. April of 2005?
18    A. Yeah.
19    Q. And what's the proper end date?
20    A. October. I don't know exactly what in October.
21    Q. Why are the dates wrong on your resume?
22    A. Well, I think once I -- I couldn't remember most
23  of it. I think I should probably spend the time calling
24  employers and finding out the actual dates I worked
25  there. Actually -- I don't know. Some of it I tried to

**60**

1  narrow my gaps and once I couldn't figure out the
2  beginning, I had trouble going forward.
3    Q. Okay. Did you have any performance issues while
4  you were at Kip's?
5    A. Near the end.
6    Q. What kind?
7    A. My position. I was demoted after I opened up
8  the restaurant. I was demoted in August.
9    Q. Why were you demoted?
10    A. They wanted an Irish person to run the pub, and
11  that wasn't performance-based. They wanted an Irish
12  person to run the pub because no pay was taken. I just
13  was -- my title was taken.
14    Q. Did you have any other performance issues?
15    A. When the gentleman came in and took the
16  position -- and I was not pleased with the fact that I
17  was demoted after all that I had just done, and when he
18  came in, it seemed as though I could do nothing right at
19  all.
20    Q. Why did you leave Kip's?
21    A. Because of him.
22    Q. What do you mean, because of him?
23    A. Because I could do nothing right. When you were
24  at a point in your position where it's painful to go in,
25  it's time for you to go.

**61**

1    Q. Did you leave voluntarily?
2    A. Yup. Yes. I'm sorry. I just stopped going in.
3  They didn't get a notice. I just stopped.
4    MS. BISCHOFF: Let's mark this.
5    (Smith Deposition Exhibit 2 marked for
6    identification by the Court Reporter.)
7    Q. (By Ms. Bischoff) What was the name of the
8  individual that took over?
9    A. John Cosgrove.
10    Q. Take a look at Exhibit 2, please.
11    MS. DOKKEN: Do you have a copy of that?
12    Q. (By Ms. Bischoff) I do. Right here.
13    A. All right.
14    Q. Please read all pages of Exhibit 2. Now,
15  Ms. Smith, have you ever seen the documents in Exhibit 2
16  before?
17    A. Only from what I received from my lawyers.
18    Q. And do you see on the first page that Kip's has
19  you being involuntarily terminated for substandard
20  performance?
21    A. I see that.
22    Q. And that's not true?
23    A. I left. I never -- I quit without giving them a
24  notice. I just stopped going into work so...
25    Q. Do you understand that Mr. Cosgrove had multiple

16 (Pages 58 to 61)

**62**

1  complaints about you?
2     A. Yes.
3     Q. Who is Sandra Malm?
4     A. She is the HR person.
5     Q. The HR person at the Marriott Southwest?
6     A. Yes.
7     Q. And because the restaurant was in the Marriott,
8  the HR functions were being handled by Sandra Malm?
9     A. Yes.
10    Q. And so let's go through the second page of
11 Exhibit 2.
12    A. All right.
13    Q. Mr. Cosgrove notes here in an e-mail to Ms. Malm
14 that you were cutting people too early. Do you see that?
15    A. Yes, ma'am.
16    Q. You had a demonstrated lack of communication?
17    A. Where's that paragraph?
18    Q. Fourth line in.
19    A. Okay.
20    Q. Do you see that?
21    A. Yup.
22    Q. Were you aware of the communications issues that
23 Mr. Cosgrove identifies here?
24    A. Okay. I need you to rephrase that. I don't
25 understand what you mean by that.

**63**

1     Q. Did Mr. Cosgrove tell you you have poor
2  communication skills?
3     A. Yes.
4     Q. And what did he -- did he give you any examples?
5     A. No.
6     Q. Did he explain to you that only managers should
7  make party inquiries?
8     A. Yes.
9     Q. And did you believe that other people could
10 handle those reservations?
11    A. No.
12    Q. Had you had your responsibilities reduced to
13 basically running the floor?
14    A. Yes.
15    Q. And how did you feel about that?
16    A. I was upset. It was embarrassing, demoralizing,
17 lots of things. But I need to work. I have four kids
18 so...
19       I just couldn't do anything right. And I never
20 said people should be taking the reservations. I said
21 they could handle the packets I created. There's a great
22 deal of difference.
23       Everything within this document is only a
24 half-truth. Some things led up to it. There was a
25 conversation with the young woman here in the later

**64**

1  pages. I never yelled at this woman, not ever.
2     Q. Did you ever talk with anyone else besides
3  Mr. Cosgrove at the Marriott Southwest about the concerns
4  you were having with your employment, the demoralizing
5  feelings you had?
6     A. Yes.
7     Q. Who else did you talk with?
8     A. Anna Lynch.
9     Q. Who's Anna Lynch?
10    A. She's my best friend and she actually worked
11 there at the time. She oversaw the host and did the
12 entertainment portions because we had bar bingo and we
13 had bands and things like that.
14    Q. So was she an equal to you or was she a
15 subordinate?
16    A. Well, she was an equal at this time. She was
17 hired and was before this. Yeah, she worked under me.
18    Q. Anyone else you spoke with?
19    A. Not that I recall. I don't know who or what I
20 may have said.
21    Q. Did you talk to any wait staff or cooks about
22 what was going on?
23    A. Maybe the chef.
24    Q. And was the chef an equal?
25    A. Kristina and I, our positions when I was GM was

**65**

1  more or less equal basis; however, I did hire her so I'm
2  not sure how that lays down that way. Then I was -- I
3  became a restaurant manager, so then she would have been
4  above me, I guess, technically.
5     Q. Did you believe that you raised anxiety levels
6  when you were on the floor?
7     A. No, I didn't. I don't believe that.
8     Q. You would agree that restaurants are high-
9  energy, fast-paced environments, though, right?
10    A. Absolutely.
11    Q. Now, this e-mail, the second page of Exhibit 2
12 is dated Wednesday, September 28. Do you see that?
13    A. Yes.
14    Q. Which comes after the fourth and fifth pages of
15 Exhibit 2, which is a Notification of Performance
16 Improvement Plan. Do you see that?
17    A. Yes.
18    Q. And I think we briefly talked -- touched on
19 this, that you yelled at an associate?
20    A. I never yelled. I just said that.
21    Q. Did you ever fraternize with other associates
22 after hours?
23    A. We did when we were building the restaurant, and
24 it was all different parts -- there were salespeople,
25 there was a lot of us because we would work all day, we

17 (Pages 62 to 65)

**66**

1 would do mock services or whatever we were doing, trying
2 to build the bar, what have you, and then we would all go
3 out and use our P-cards. It wasn't just me. It was
4 other -- it was other people of upward positions. There
5 was director of catering and sales and people with the
6 CSM.
7     Q. What is a P-card?
8     A. Purchasing card is the short term, but you're
9 issued a card from your company, because as a GM I have
10 purchasing power, meaning, and as I'm opening the
11 restaurant I needed to build everything, including an
12 office. I needed to get paper and pens. So anything I
13 needed to purchase. I had to get ash trays for the deck
14 or whatever it is. That's what I would use that for.
15 And then you just do paperwork and turn it in through
16 your corporate.
17     Q. So you would use your P-card when you went out
18 with other people?
19     A. Yeah, because it was -- well, kind of like
20 brainstorming. We'd be sitting -- because there was
21 nothing to eat in our building, we didn't even have a
22 restaurant running so we would work, work, work, and then
23 we were planning the grand opening party or we'd be
24 working on marketing things, so some of the people that
25 were already working there before this restaurant went up

**67**

1 and went live, there was a lot of people working. And
2 some of those people would be deemed as subordinates,
3 absolutely.
4     Q. Did you drink alcohol?
5     A. Yes, ma'am. We all did.
6     Q. Was there a minor consuming alcohol on one
7 occasion?
8     A. I heard a story about it but never -- never was
9 I there. I heard that one of our waitresses was at that
10 place and was under age and was drinking, but I don't
11 know how I'm responsible for other people when I wasn't
12 there.
13     Q. Okay. You seem to be indicating, Ms. Smith,
14 that this two-page performance improvement plan, that the
15 things on here are not true?
16     A. That's correct.
17     Q. So nothing on here is true?
18     A. Well, there's -- you know, about taking
19 reservations, I didn't say they should take reservations.
20 I wanted to hand out the packets with information, with
21 menus, that described our private dining rooms. That's
22 what I wanted them to do. So it seems to be there was
23 some conversation with a server. I never yelled at the
24 server.
25     I said what is going on with your tables, and I

**68**

1 used that type of a tone because I was concerned. Our
2 guests are not happy and our guests pay our paycheck
3 ultimately, so I'm passionate about what I do. I never
4 yelled. So there are -- it's almost misconstrued, most
5 of it.
6     Q. Do you think Mr. Cosgrove was out to get you?
7     A. I sure feel that way, yes, ma'am.
8     Q. So nothing on the last two pages -- or I'm
9 sorry, these two pages, Kip's 007 and Kip's 008 of the --
10 of Exhibit 2 are true. And you see the next page which
11 is documentation of the fraternizing issue. Do you see
12 that?
13     A. Yes.
14     Q. And that was not true as well?
15     A. Well, I went -- we did go out with the staff.
16 The staff would go out. We'd been doing it since April.
17 I mean, the actual -- yeah, I guess if you want to cut it
18 down to it, yes, we were all fraternizing, you know what
19 I mean? But it wasn't just me. It was the other
20 managers as well inside the building and there was no
21 fraternization policy. There wasn't one. It didn't even
22 exist. And if there's an issue, I'm wondering why
23 nothing was arisen in April or all the way through until
24 Mr. Cosgrove arrived.
25     Q. When did Kip's -- when did the actual pub open?

**69**

1     A. June.
2     Q. So in June prior to that you were going out
3 using your P-card and brainstorming with other people?
4     A. Right.
5     Q. Why were you going out in late August?
6     A. We just -- sometimes we did. I mean, we did our
7 grand opening party in July. And that was 3,000 people
8 attended our grand opening party. It was a huge success.
9 But it was a ton of work and I worked non-stop. I worked
10 basically seven days a week. I never took time off. I
11 couldn't because we'd have computer issues or whatever.
12     I didn't -- until Molly came on board, we had no
13 assistant manager, nothing. It was me and these people I
14 brought in to help to run -- help me do the bar and set
15 this place up.
16     Q. Ms. Smith, why did you go out in late August of
17 2005?
18     A. Because -- I don't know. After work, we went
19 out.
20     Q. Okay. So you went out for multiple reasons?
21     A. Yes.
22     Q. You went out to use your P-card to brainstorm?
23     A. Certainly in the beginning, yes.
24     Q. And you went out in late August to kick back
25 from work?

18 (Pages 66 to 69)

70

1   A. Yes, ma'am.
2   Q. And so you may not be at that point doing work
3 when you're out with people --
4   A. At that point we were not, no.
5   Q. Okay. Did you have a meeting with Mr. Cosgrove
6 that you remember on or about August 29, which is Kip's
7 0010 of Exhibit 2?
8   A. Yes.
9   Q. Did you read this portion?
10   A. Yes.
11   Q. Okay. And is there things in here that are not
12 true?
13   A. When he's referring to the keys, I always had
14 keys to the entire establishment. And when he came on
15 board, which was right in this time frame here, he wanted
16 me to start doing the procedure of signing them in and
17 out. That's what he refers to, yes. So yes, that is
18 true and that is exactly what I did, as he asked me to
19 do.
20   Q. Okay. But you've already said that you didn't
21 yell at Shannon McLaughlin?
22   A. Right. And it's even stated within there, she
23 insisted that she did not yell. I did not yell.
24   Q. Oh, I understand that. What I'm trying to get
25 at is what is seen here, the incident that you yelling at

71

1 a wait staff --
2   A. Okay. I'm not -- yes, I discipline my staff on
3 a regular basis. Yes, it has to happen.
4   Q. Ms. Smith, let me finish my question.
5   A. I'm sorry.
6   Q. The statement in here you yelled at a staff
7 you're claiming is not true?
8   A. Correct.
9   Q. Did he tell you that you needed to use positive
10 reinforcement with staff?
11   A. Yes. He said that.
12   Q. Turning the page to Kip's 0011, here is a note
13 from Sandra Malm, the human resources director, about not
14 wearing an appropriate uniform. Do you see that?
15   A. Yes.
16   Q. Did you wear inappropriate uniform?
17   A. I wore khaki slacks and that was inappropriate,
18 so yes.
19   Q. Do you remember when you stopped going to work
20 at Kip's?
21   A. It had to be like the very last week of
22 September or the first week of October, right in there.
23   Q. Did you receive unemployment after Kip's?
24   A. No.
25   Q. What was your next job after Kip's?

72

1   A. I worked at the Green Mill.
2   Q. Why isn't the Green Mill on your resume, which
3 is Exhibit 1?
4   A. I worked there for a very short period of time
5 and I omitted it from my resume.
6   Q. Why?
7   A. As you look at my resume I felt that, although
8 in my business we do move jobs often, I looked like a job
9 jumper at this point, so I omitted it. I worked there
10 from October until -- gosh, what was it? Like February,
11 March. No, no, no. It was before that. I would say
12 maybe January.
13   Q. And what was your position at the Green Mill?
14   A. Assistant general manager.
15   Q. And why did that position end?
16   A. I was brought in to have my review, like 90-day
17 review. And at that time my job got eliminated.
18   Q. Did you have any performance issues?
19   A. Not that I'm aware of. I mean, not -- I mean,
20 we didn't -- no.
21   Q. And what was the position after the Green Mill?
22   A. I worked at the Minneapolis Hilton.
23   Q. So you were out of work from the Green Mill from
24 January at some point to April of 2006?
25   A. That's correct.

73

1   Q. Did you receive unemployment during that period?
2   A. Yes, I did.
3   Q. Any other positions that are not listed on your
4 resume?
5   A. Buca di Beppo. And I have to think. Actually I
6 worked at between Kip's and The Melting Pot so in between
7 there Buca comes in.
8   Q. What was your position with Buca?
9   A. I was a restaurant manager, is what they call
10 it.
11   Q. What location?
12   A. I was placed in the St. Paul location.
13   Q. Did you like the position there?
14   A. I did. It's crazy busy.
15   Q. Because it's crazy busy did you feel it caused
16 you stress in your life?
17   A. Not in my life as much because I worked mostly
18 nights and they worked really well around my, you know,
19 trying to be good to me as far as scheduling goes because
20 with four kids it's difficult to do the child care. So
21 that was really, really nice. I was fast-track GM, or
22 Pisano is what they call it, Pisano partner.
23   Q. Why did you leave Buca di Beppo?
24   A. I was terminated.
25   Q. Why were you terminated?

19 (Pages 70 to 73)

## 74

1    A. I broke company policy.
2    Q. How so?
3    A. There was a new drink menu rolled out, and my GM
4  or Pisano had made all the drinks and all the staff,
5  while we're working, were trying these drinks. And I
6  took the drink and put it in a smaller glass so I could
7  try it, and I went into our office to do some of my
8  paperwork, and that is a clear and blatant infraction of
9  our policies.
10    Q. Did you know of that policy?
11    A. I know that I did, and I don't know why that I
12  did it. When I was asked about it I was honest about it
13  and that resulted in my termination.
14    Q. Do you think your termination was fair?
15    A. I do, you know. It was upsetting at the time,
16  but yeah, I do. I broke the rules. I should have not
17  done that.
18    Q. Why isn't Buca di Beppo on this list?
19    A. Again, I wasn't there a huge amount of time and
20  I just thought it looked bad to have so many jobs in a
21  short period of time so I eliminated it from the resume.
22    Q. How long were you there?
23    A. Nine months maybe.
24    Q. Any other positions not listed on this resume at
25  this period of time?

## 75

1    A. That's what I'm thinking. There's some before,
2  like my job before I worked at Sofitel. Gosh. Let me
3  think.
4    Q. Any positions since Canteen of Minnesota that
5  you've already described?
6    A. Not that I'm recalling.
7    Q. Do you currently work?
8    A. Yes.
9    Q. And what is your current position?
10    A. I'm a cook.
11    Q. Where?
12    A. Mary T. Incorporated.
13    Q. Where is Mary T. Incorporated located?
14    A. Corporate headquarters? Coon Rapids. And I
15  actually work in Coon Rapids as well.
16    Q. Is there a restaurant that you work in have a
17  different name?
18    A. It's not a restaurant. Mary T. Incorporated
19  actually does nursing homes, home health care, assisted
20  living, cared living, group homes, so it's in the health
21  industry.
22    Q. Do you like your position?
23    A. I love my job.
24    Q. Why?
25    A. The hours are wonderful. I'm able to be there

## 76

1  for my kids, drive them to and from school. The people I
2  work with are amazing, and I feel like I make a
3  difference. I think I finally found my home and that's
4  what I've been searching for.
5    Q. Are you looking for another position at this
6  time?
7    A. No. I just work there. I sometimes will work
8  at Margaret Place, which is also a Mary T. property. And
9  I write menus for my building and two other buildings. I
10  order food for my building and two other buildings.
11    I also do all the scheduling for the building
12  that I work in so I'm able to do some -- a portion of
13  this work at home in order to get more hours, which is
14  awesome too, that I work for employers who allow me to do
15  that.
16    MS. BISCHOFF: Should we take another
17  break?
18    THE WITNESS: Sure.
19    (Recess taken between 10:45 a.m. and 10:58 a.m.)
20    Q. (By Ms. Bischoff) Ms. Smith, so would it be a
21  fair characterization to say that you've been terminated
22  from Buca di Beppo, Kip's, and any other employment?
23    A. I was terminated from Buca and I was terminated
24  from Prima. I was not terminated from Kip's.
25    Q. You just stopped going to work?

## 77

1    A. Yes, ma'am.
2    Q. Did you just stop going to work because you were
3  angry at how you were being treated?
4    A. Mostly. And I also had found a job at the Green
5  Mill and I was terminated -- I guess I terminated or
6  whatever. They eliminated my position and told me to
7  take unemployment so I guess that's considered
8  termination.
9    Q. And then you voluntarily left The Melting Pot?
10    A. Yes.
11    Q. Olive Garden?
12    A. Yes.
13    Q. Napa Valley Grill?
14    A. Yes.
15    Q. Ground Round?
16    A. Yes.
17    Q. Sofitel?
18    A. Yes.
19    Q. And Canteen of Minnesota?
20    A. Yes.
21    Q. How did you hear about the position with the
22  Hilton Minneapolis?
23    A. I saw the position on the Internet on one of the
24  job sites, and I can't remember which one it is.
25  Something Minnesota, probably, one of those job sites.

20 (Pages 74 to 77)

**78**

1  And I had originally applied to the position online and
2  then was sent -- this is funny.  I was sent back a thing
3  saying thanks but no thanks, thanks for -- I even got a
4  little card they send in the mail saying, you know, we
5  got your application.  Thank you but we're, you know,
6  looking at other candidates.
7      Then I was called by Jim Vennewitz out of the
8  blue about two or three weeks later and said I saw your
9  resume in Monster.  And so really it was the Hilton who
10  initiated our relationship, I guess, so to speak.  Kind
11  of funny.
12      (Smith Deposition Exhibit 3 marked for
13      identification by the Court Reporter.)
14      Q.  (By Ms. Bischoff) Ms. Smith, would you please
15  take a look at Deposition Exhibit No. 3.  And I'll
16  represent to you there's two parts to Exhibit 3.  There's
17  the first two pages, which appears to be a resume, and
18  the second two pages, which appears to be your
19  application.
20      A.  Yes.
21      Q.  Is that correct?
22      A.  Yes.
23      Q.  Okay.  Can you take a look at Exhibit 3, please.
24  Let me know when you're done.
25      A.  Okay.  Yes.

**79**

1      Q.  So Exhibit 3, the first page, which looks like
2  the first page of your resume, has different dates that
3  are different than Exhibit 1?
4      A.  Correct.
5      Q.  And the years are different.  Do you see that?
6      A.  I see -- yes, I see that.
7      Q.  Which dates are correct, Exhibit 1 or Exhibit 3?
8      A.  The ones on this one are more accurate but the
9  months are incorrect as well.
10      Q.  On Exhibit 3?
11      A.  So, for instance, on Sofitel, I know that I
12  started in 1996, quite frankly, because my baby was born
13  in '95.  Or it might have been '95 in the winter.  But I
14  know that that's incorrect.  I worked through September
15  of '98, though, for instance.  And then this is more
16  factual, the Ground Round.
17      Q.  On Exhibit 3?
18      A.  On Exhibit 3, yes.  Prima, February of '01, yup.
19  Napa and Prima, yeah.  So Exhibit 3 is more factual.
20      Q.  But still not entirely correct?
21      A.  Correct.  That's correct.
22      Q.  If you could look at page 3 of Exhibit 3.  This
23  is your employment application.
24      A.  Yes.
25      Q.  When did you fill this employment application

**80**

1  out?
2      A.  As I was applying for the position at the
3  Minneapolis Hilton.
4      Q.  So at the same time you gave your resume you
5  completed this?
6      A.  Yes.
7      Q.  Now, on here you have dates for the employment
8  for these positions as well.  Do you see that?
9      A.  Where is it?
10      Q.  If you look in the boxes on the bottom half of
11  the page it has From/To dates, the third line.
12      A.  Yes, I see it, correct.
13      Q.  Are these dates correct?
14      A.  Well, I keep writing May but, for instance, CSM,
15  I started in April so I don't really know why I write
16  May.  I didn't work until December.  I worked until
17  October.
18      Q.  And for The Melting Pot, are those dates
19  correct?
20      A.  No.  I know that I started in October but I
21  ended in June or July, so no.
22      Q.  And then the Olive Garden dates, are they
23  correct?
24      A.  I believe those are correct.
25      Q.  And the Prima Restaurant dates?

**81**

1      A.  The end date is -- I think it's correct.  No.
2  It's probably about -- the month is incorrect on the end
3  date.
4      Q.  Okay.  What should the month be?
5      A.  Well, probably the year too.  It should be
6  January.
7      Q.  Okay.  Of 2003?
8      A.  Yes.
9      Q.  Okay.  Can you look at the next page, the last
10  page of Exhibit 3.
11      A.  Okay.
12      Q.  It says you found the Hilton through Career
13  Builder?
14      A.  That might have been where Jim saw me, yes.
15      Q.  Okay.  And you completed two years of community
16  college at Normandale?
17      A.  I went off and on.  They weren't complete.
18      Q.  Okay.  So do you know how many years of college
19  you completed?
20      A.  Like if you added it up, I went off and on for
21  two years, but probably only four- or five-month span
22  maybe.
23      Q.  Okay.  Any other educational experiences you've
24  had?
25      A.  You mean like secondary college, that kind of

21 (Pages 78 to 81)